

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

### NO. PD-1370-07

### RASHIK ALI TAYLOR, Appellant

### v.

### THE STATE OF TEXAS

### ON APPELLANT'S PETITION FOR DISCRETIONARY REVIEW
### FROM THE FIRST COURT OF APPEALS
### HARRIS COUNTY

PRICE, J., delivered the opinion of the Court in which MEYERS, JOHNSON, HOLCOMB and COCHRAN, JJ., joined. WOMACK, J., filed a concurring opinion in which KELLER, P.J., and KEASLER and HERVEY, JJ., joined.

### O P I N I O N

The appellant was convicted of the offense of aggravated sexual assault of a child younger than fourteen.[1]  The jury assessed his punishment at ten years' confinement in the penitentiary.   The evidence against the appellant consisted of the testimony of the

---

[1]

  *See* TEX. PENAL CODE § 22.021(a)(1)(B)(i) & (a)(2)(B) ("A person commits an offense . . . if the person . . . causes the penetration of the . . . sexual organ of a child by any means . . . and . . . the victim is younger than 14 years of age[.]").

complaining witness, J.B., and a licensed professional counselor who had been counseling J.B. for some months after the offense came to light. On appeal, the appellant argued that certain testimony from the counselor, summarizing what J.B. had told her about the offense, had been improperly admitted over his hearsay objection. The First Court of Appeals held that the counselor's testimony was admissible under the hearsay exception for statements made for purposes of medical diagnosis or treatment.[2] We granted the appellant's petition for discretionary review to examine whether the hearsay exception embodied in Rule 803(4) of the Texas Rules of Evidence should apply under the circumstances.[3]

## FACTS AND PROCEDURAL POSTURE

### At Trial

The complaining witness, J.B., was thirteen years old at the time of the offense, and fourteen when she testified. She had been living mostly with her grandmother for the past two or three years because her mother was a drug abuser and a prostitute, "in and out of jail." She was a good student who admitted that she could probably do even better in school. At least on a cold record, she gives the impression of possessing a certain street savvy. The following account derives entirely from J.B.'s testimony, which made up the bulk of the

---

[2] *Taylor v. State*, ___ S.W.3d ___, 2007 WL 2214859 (Tex. App.—Houston [1st], delivered August 2, 2007). *See* TEX. R. EVID. 803(4). In a separate concurring opinion, Justice Jennings disagreed that the counselor's testimony fit the exception under Rule 803(4), but he believed that the error in admitting that testimony was harmless.

[3] TEX. R. APP. P. Rule 66.3 (d), (e).

State's case against the appellant. There was no forensic evidence to back up her story.

Sometime in March of 2005, while J.B. was on her spring break from school, she met the appellant, who was her mother's friend, for the first time. She knew him only by his nickname, "Skinny Man." Several weeks after she first met the appellant, J.B. was in a motel room one evening with her mother and "Uncle Lazy," a drug dealer who was the boyfriend of J.B.'s aunt. J.B. and her mother were drinking wine. Soon J.B.'s mother begin to crave drugs, so Uncle Lazy and J.B. drove her in a borrowed van to an apartment complex where she could prostitute herself for cocaine. Later, J.B.'s mother called to say that her abusive ex-boyfriend had abducted her and asked J.B. to call the appellant. The appellant drove to the motel and picked up J.B. and Uncle Lazy. He offered them cocaine, then suggested that Uncle Lazy go by himself to rescue J.B.'s mother. Uncle Lazy refused to leave J.B. alone with the appellant, so all three of them got into the appellant's car. The appellant put his hand on J.B.'s leg, but she pushed it off. They drove to the motel in which the appellant was staying. J.B. accompanied the appellant to his room, where he retrieved a nine-millimeter gun. While in the motel room, the appellant told J.B. that he wanted her and her mother to move in with him. "And then he was like, well, I just want to spend time with you, all this kind of stuff."

They left the motel and drove to another apartment complex that J.B. did not recognize. The appellant and Uncle Lazy got out of the car and began a conversation at the rear of the vehicle that J.B. did not pay attention to. But then she noticed that the appellant

had pulled out his gun and was pointing it at Uncle Lazy. J.B. then "jumped in front of the gun and grabbed my uncle." The appellant tried to wrest her from Uncle Lazy, and pulled out a different, smaller caliber gun and held it to J.B.'s head. J.B. let go of Uncle Lazy and let the appellant put her back in the car. But she immediately jumped out of the window and began to run through the apartment complex. She heard a gun shot and assumed that the appellant had shot Uncle Lazy.[4] When it became clear to J.B. that the appellant was going to catch her, she stopped running. He took her back to the car. She did not see Uncle Lazy anywhere. The appellant then drove her back to his motel.

Once back at the motel, J.B. tried to run again, but the appellant found her and took her to his room. There they did several lines of cocaine,[5] and then the appellant asked J.B. to lie on the bed and disrobe. She did so because she felt "threatened and intimidated." The appellant then disrobed and had sex with J.B. She testified that it hurt the entire time, and she tried to push him off. "And every time I said stop or pushed harder, it would be – so I just gave up. * * * I'm wasting my energy. The more – I knew the more I fight the longer it would take. I knew that. So I just stopped." J.B. estimated that the assault lasted between one-and-a-half and two-and-a-half hours. When it was over, the appellant threw a bag of

---

[4] Uncle Lazy turned up later, unharmed.

[5] J.B. testified that at this point she was "needing for it," because she had been using cocaine "for practically every day that month" while in the company of her mother, including earlier that evening. "I was like I know when I do coke I'm okay. So I did it. I did a couple of lines. He did a couple of lines." On cross-examination J.B. admitted that she used cocaine, marijuana and Xanax.

crack cocaine in her lap and told her it was for her mother, leading J.B. to suspect that her mother may have prostituted her to the appellant in exchange for drugs. The appellant then took J.B. back to her mother's motel, where her grandmother was waiting to take her home.

Because J.B. had been truant, a counselor from school called her over the weekend. J.B. asked the counselor, "[W]hat does rape mean?" On Monday, J.B. disclosed her ordeal to the school counselor, who in turn reported it to Child Protective Services. J.B. eventually underwent a medical examination, but only to determine whether she was pregnant or had contracted any sexually transmitted disease. About a month after the assault, J.B. began to see a therapist "through Child Advocacy."

> Q. Now, you also stated you started getting therapy. What were you getting therapy for?
>
> A. Post traumatic stress disorder. A little bit before all this had happened like towards the end of February beginning of March I had been diagnosed as bipolar. CPS thought it was best that I started to receive therapy. They didn't want me to start cutting myself because of what had happened.[6]
>
> Q. So did you start seeing a therapist?
>
> A. I started seeing a therapist.
>
> Q. Do you know when that was?
>
> A. That was – it started – like it started like a month or so after everything had happened. Like CPS got like really, really got involved and everything.

---

[6] When she was ten years old, J.B. had apparently cut herself on an unspecified number of occasions. Uncle Lazy had given her marijuana and Xanax in an effort to calm her down.

Q. Are you still seeing a therapist to this day?[7]

A. Yes.

Q. What's your therapist's name?

A. Denise Fuller.

On cross-examination, J.B. confirmed that she had talked about "this incident" with Denise Volet. It is not clear whether Denise Volet and Denise Fuller are one and the same.[8]

Denise Volet testified that she is a licensed professional counselor, formerly with Child Protective Services and in private practice at the time of trial, with extensive experience counseling victims of sexual assault and abuse. According to Volet, J.B. had begun therapy with another therapist at the Child Advocacy Center, but "there was a conflict of interest there since they work with CPS and everything, so [J.B.] was referred to me."[9] J.B. began therapy with Volet on June 24, 2005, at least several months after the offense.[10]

---

[7] The trial occurred in December of 2005, some eight or nine months after the assault.

[8] The appellant argues that they are not, and that the record therefore fails to establish that J.B. was receiving counseling from Volet for PTSD. The court of appeals did not address this contention. In view of our ultimate disposition, we need not resolve this ambiguity in the record.

[9] Volet was not asked to identify the initial therapist whom J.B. saw. It is conceivable that this initial therapist was the "Denise Fuller" whom J.B. named in her direct testimony. This seems unlikely, however, given that she identified "Denise Fuller" as the therapist whom she was "still seeing . . . to this day[.]"

[10] The indictment alleges that the sexual assault occurred on or about May 27, 2005. But from J.B.'s testimony it is apparent that the offense must have occurred sometime in the latter part of March or early part of April, not in May, of 2005.

Volet had been seeing J.B. on a weekly basis right up until the time of trial. The portion of her testimony that is relevant to the issue in this case is as follows:

Q. And what sort of issues are you working with [J.B.] on?

A. The resolution of the rape and the sexual assault. The resolution of the mother/daughter issues. Anger management. Learning how to control her own behaviors and making the right choices. And judgment decisions.

Q. Did she tell you the facts about the rape?

A. She did give me some details.

Q. What details did she give you?

[DEFENSE COUNSEL]: Objection. Calls for hearsay.

[PROSECUTOR]: This is a statement made for diagnosis or treatment, Your Honor.

[DEFENSE COUNSEL]: Although she is a licensed counselor, if I can ask her a question or two on voir dire before you make a decision on this? Would that be okay, Your Honor?

THE COURT: Okay. Take her on voir dire.

VOIR DIRE EXAMINATION

BY [DEFENSE COUNSEL]:

Q. Are you a medical doctor?

A. No, sir.

Q. Are you a psychiatrist?

A. No, sir.

Q. Are you under the supervision of a medical doctor or psychiatrist?

A. No, sir.

Q. You're not connected to any kind of medical doctor or psychiatrist in any way?

A. No, sir.

[DEFENSE COUNSEL]: Your Honor, I object. These are hearsay statements that are not made in the course of treatment.

[PROSECUTOR]: She is a licensed therapist treating [J.B.] for the issues that she described.

THE COURT: Overruled.

DIRECT EXAMINATION (continued)

BY [PROSECUTOR]:

Q. What did she tell you about what had happened?

A. She referred to the gentleman as Skinny. That's the name that she had for him. And how basically her mother had sent her to go with him. They went to a motel. She talked about being in a car. Talked about there being a gun. She talked about going upstairs into the room. Being afraid, knowing that something wasn't right and was going to happen. Skinny asking her to take her clothes off and her telling him she didn't want to. And trying to resist. She talked about the gun being on the night stand on the table. Her taking her clothes off. Getting on the bed. Skinny having sex with her. That it hurt. And she tried to get away from him and just couldn't. Then when it was over she talked about, you know, leaving. Being in the car. At some point the gun was in her lap for some reason. And she talked about that she had the thought of I just should shoot him now. She talked about doing drugs. Doing cocaine. I remember cocaine. I don't remember exactly what it was they drank. But she had been drinking and doing drugs. Had been given those things. She remembered getting out of the car. And what's typical of a victim of rape or abuse.

* * *

     Q. What issues were you addressing with her regarding the rape? What was her reaction to the rape?

     A. Anger, number one. She was a very angry young lady. Betrayal she felt from her mother.

Volet then went on to describe characteristics that are common to children who have suffered from sexual abuse and indicated that J.B. displayed some of these characteristics.[11] Based upon this evidence,[12] the jury convicted the appellant and, after a punishment hearing, sentenced him to serve a term of ten years in the penitentiary.

## On Appeal

On appeal, the appellant argued that the trial court erred in admitting Volet's testimony as a statement made for the purpose of medical diagnosis or treatment over his hearsay objection. The court of appeals affirmed his conviction, however, holding that the trial court did not abuse its discretion to admit the testimony.[13] The court of appeals noted that both the federal courts and some Texas courts have held that the hearsay exception at issue may extend to statements made to professional counselors and psychotherapists.[14]

---

[11] The appellant objected to this latter testimony as well, but did not complain of the trial court's ruling overruling his objection on direct appeal.

[12] The only other witness was a Houston police officer who testified that, in May of 2005, she showed J.B. a photo spread to see whether J.B. could identify the perpetrator, and J.B. made a positive identification of the appellant's photograph.

[13] *Taylor v. State*, *supra*, at *5.

[14] *Id.* at *4-*5. *See, e.g., Wilder v. State*, 111 S.W.3d 249 (Tex. App.—Texarkana 2003, pet. ref'd); *Puderbaugh v. State*, 31 S.W.3d 683 (Tex. App.—Beaumont 2000, pet. ref'd); *Gohring v.*

Noting also that J.B. testified that she was in therapy for post-traumatic-stress disorder, the court of appeals found it reasonable to infer that she understood that the purpose of her therapy was to treat a medical condition.[15] The court of appeals also found that J.B.'s statements to Volet were reasonably pertinent to "her issues concerning the resolution of the sexual assault."[16] Given this state of the record, the court of appeals held that the trial court did not abuse its discretion to admit Volet's testimony recounting J.B.'s out-of-court account of the circumstances of the sexual assault.

Justice Jennings concurred in the result only.[17] Noting his agreement with several decisions from the Austin Court of Appeals,[18] he opined that the hearsay exception for statements made for purposes of *medical* diagnosis or treatment should not be interpreted to cover statements made for purposes of mental-health treatment.[19] He also rejected any

---

*State*, 967 S.W.2d 459 (Tex. App.—Beaumont 1998, no pet.); *United States v. Kappell*, 418 F.3d 550 (6th Cir. 2005).

[15] *Id*. at *5.

[16] *Id*.

[17] *Id*. at *8-*11.

[18] *Perez v. State*, 113 S.W.3d 819 (Tex. App.—Austin 2003, pet. ref'd); *Moore v. State*, 82 S.W.3d 399 (Tex. App.—Austin 2002, pet. ref'd).

[19] *Taylor v. State*, *supra*, at *8-*9. Justice Jennings concluded that "[t]he rationale behind the hearsay exception for statements made for purposes of 'medical diagnosis or treatment' regarding a patient's physical condition simply has nothing to do with mental processes and behavior or the providing of guidance and advice by a counselor." *Id*. at *9.

construction of the exception that would allow admission of statements made in the course

of long-term counseling or psychotherapy, after a diagnosis has been made and a course of

treatment decided upon, since, in his view, the rationale underlying the exception would no

longer apply.[20]  Because he viewed the error as harmless, however, he concurred in the

majority's decision to affirm the trial court's judgment.[21]  We granted the appellant's petition

for discretionary review in order to address and resolve the apparent conflict in the courts of

appeals with respect to the proper scope of Rule 803(4).[22]

## THE LAW

### The Rule

"Hearsay is not admissible except as provided by statute or [the Rules of Evidence]

or by other rules prescribed pursuant to statutory authority."[23]  Once the opponent of hearsay

evidence makes the proper objection, it becomes the burden of the proponent of the evidence

---

[20]

*Id*. at *9.  Quoting from the Austin court's opinion in *Perez v. State*, *supra*, at 830, which in turn quotes *Jones v. State*, 92 S.W.3d 619, 623 (Tex. App.—Austin 2002, no pet.), Justice Jennings observed:

> "Rule 803(4) is premised on the patient's selfish motive in receiving appropriate treatment."  This motive is no longer present once a diagnosis has been made and treatment has begun.  The details a patient may report during an extended course of treatment may be prompted by other motives, such as denial or deception, or be influenced by the treatment process itself.

[21]

*Id*. at *10-*11.

[22]

Tex. R. App. P. 66.3 (a), (e).

[23]

Tex. R. Evid. 802.

to establish that an exception applies that would make the evidence admissible in spite of its hearsay character.[24] One such exception is embodied in Rule 803(4), which provides:

> The following are not excluded by the hearsay rule, even though the declarant is available as a witness:
>
> \* \* \*
>
> **(4) Statements of Purposes of Medical Diagnosis or Treatment.** Statements made for purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment.[25]

In determining whether a trial court erred in admitting or excluding hearsay evidence under such an exception to the hearsay rule, a reviewing court looks to see whether the trial court clearly abused its discretion; before the reviewing court may reverse the trial court's decision, it must find the trial court's ruling was so clearly wrong as to lie outside the zone within which reasonable people might disagree.[26] Of course, the trial court's discretion must be informed by a proper understanding of the law. In the instant cause, the disagreement between the majority and concurring opinions below turned upon a difference in their construction of Rule 803(4)—a disagreement as to the scope of the law—rather than a dispute as to how well-settled law should be applied to the facts of this case.

---

[24]

*E.g., Martinzez v. State*, 178 S.W.3d 806, 815 (Tex. Crim. App. 2005); *Cofield v. State*, 891 S.W.2d 952, 954 (Tex. Crim. App. 1994).

[25]

TEX. R. EVID. 803 (4).

[26]

*Zuliani v. State*, 97 S.W.3d 589, 595 (Tex. Crim. App. 2003).

Because our Rule 803(4) is identical to its federal counterpart in the Federal Rules of Evidence,[27] it is appropriate to look to federal cases and commentary for guidance in its proper construction.[28] When we canvass both the federal case law and also cases from our own courts of appeals construing our Rule 803(4) in light of the federal case law, we find a core area of consensus, but also some fundamental disagreements on the periphery. What follows is a description of that case law, particularly as it bears upon the specific question before us: Does Rule 803(4) provide for the admissibility of statements made to a licensed professional counselor in the context of on-going, long-term therapy?

## Federal Case Law

The Eighth Circuit Court of Appeals has taken the lead in construing Federal Rule 803(4).[29] In the seminal case of *United States v. Iron Shell*,[30] the nine-year-old victim of an assault with intent to commit rape was examined by a physician on the same evening that the offense occurred. The physician testified at trial to the victim's description of the offense

---

[27] *See* FED. R. EVID. 803(4).

[28] *E.g.*, *Coffin v. State*, 885 S.W.2d 140, 147 n.4 (Tex. Crim. App. 1994) ("Cases and commentaries interpreting the Federal Rules of Evidence are instructive in our construction of similarly worded provisions in our own rules.").

[29] A high proportion of the relevant federal cases involve prosecutions for crimes committed by or against Native Americans on Indian reservations, over which the federal courts have exclusive jurisdiction. *See* 18 U.S.C. § 1153. For this reason, many of the cases construing Federal Rule 803(4) have arisen in the Eighth and Tenth Circuits.

[30] 633 F.2d 77 (8th Cir. 1980).

during the examination.[31]   The issue in the appeal was whether that description was "pertinent to the diagnosis or treatment" of the victim.[32]  The court of appeals held that the evidence constituted a description of the general character of the cause of the victim's vaginal injury and therefore fell within the parameters of Rule 803(4).[33]  Along the way, the Eighth Circuit made the following observations about Rule 803(4):

> The rationale behind the rule has often been stated.  It focuses upon the patient and relies upon the patient's strong motive to tell the truth because diagnosis or treatment will depend in part upon what the patient says.  It is thought that the declarant's motive guarantees trustworthiness sufficient to allow an exception to the hearsay rule.  * * *  Judge Weinstein, in his treatise, suggests another policy ground.  He writes that "a fact reliable enough to serve as the basis for a diagnosis is also reliable enough to escape hearsay proscription." [4] Weinstein & Berger, [Weinstein's Evidence] at 803-129 [1979].  This principle recognizes that life and death decisions are made by physicians in reliance on such facts and as such should have sufficient trustworthiness to be admissible in a court of law.  * * *  Thus, two independent rationales support the rule and are helpful in its application.  A two-part test flows naturally from this dual rationale: first, is the declarant's motive consistent with the purpose of the rule; and second, is it reasonable for the physician to rely on the information in diagnosis or treatment.[34]

Applying the first part of this test, the court of appeals observed that there were no facts in

---

[31] *Id*. at 81-82.

[32] *Id*. at 83.

[33] *Id*.

[34] *Id*. at 83-84.  The United States Supreme Court has observed that "a statement made in the course of procuring medical services, where the declarant knows that a false statement may cause misdiagnosis or mistreatment, carries special guarantees of credibility that a trier of fact may not think replicated by courtroom testimony." *White v. Illinois*, 502 U.S. 346, 356 (1992).

the record that the victim's motives in describing the assault to the physician "was other than as a patient seeking treatment."[35]  Because the physician expressly explained in his testimony that knowing the cause of the injury had been important in guiding his physical examination of the victim, telling him what to look for and what not to look for, the court of appeals also held that it had been reasonable for him to rely on the victim's statement in making his diagnosis and deciding on treatment.[36]

The Advisory Committee Notes to Federal Rule 803(4) indicate that statements as to "fault" are not typically pertinent to diagnosis or treatment, and are therefore not admissible consistent with the rationale behind the rule.[37]  In *Iron Shell*, the court of appeals had pointed out that the victim's statement had not included information as to the identity of her assailant, and observed in dicta, with specific reference to the Advisory Committee Note, that such information would "seldom, if ever," be pertinent to diagnosis or treatment.[38]  In *United States v. Renville*,[39] the Eighth Circuit squarely confronted the question whether an eleven-

---

[35]  *Id*. at 84.

[36]  *Id*. at 84-85.

[37]  FED. R. EVID. 803 (4) advisory committee notes ("Statements as to fault would not ordinarily qualify [as a statement for purposes of diagnosis or treatment].  Thus, a patient's statement that he was struck by an automobile would qualify, but not his statement that the car was driven through a red light.").

[38]  633 F.2d at 84.

[39]  779 F.2d 430 (8th Cir. 1985).

year-old victim's statement made to a physician during an examination following a sexual assault that actually identified her assailant was admissible under Rule 803(4). Notwithstanding its dicta in *Iron Shell*, the Eighth Circuit held in *Renville* that "[s]tatements by a child abuse victim to a physician during an examination that the abuser is a member of the victim's household *are* reasonably pertinent to treatment."[40]  The physician in *Renville* had specifically testified that child abuse involves more than just physical injury, and that part of the medical evaluation includes an assessment of "the emotional and psychological injuries which accompany the crime."[41]  Furthermore, the doctor testified, "[t]he exact nature and extent of the psychological problems which ensue from child abuse often depend on the identity of the abuser."[42]  Indeed, if the abuser is a family member, it would be important to intervene to see that the child is removed from harm's way.[43]  For these reasons, the court of appeals in *Renville* concluded that the victim's statement, including the identity of the perpetrator, was shown to be pertinent to her diagnosis and treatment.[44]

The *Renville* court then turned to the question of whether the victim had been

---

[40] 779 F.2d at 436.

[41] *Id*. at 437.

[42] *Id*.

[43] *Id*. at 438.

[44] *Id*.

motivated by the knowledge that her statement had been made for purposes of diagnosis or treatment. The court of appeals observed that the physician had expressly explained to the victim that the questions he asked her as part of his examination "were necessary to obtain information to treat her and help her overcome any physical and emotional problems which may have been caused by the recurrent abuse."[45] At least "where the physician makes clear to the victim that the inquiry into the identity of the abuser is important to diagnosis and treatment, and the victim manifests such an understanding[,]" the court of appeals concluded, the rationale behind the hearsay exception is served.[46] Because nothing in the record suggested that the victim's motive during the examination had been anything "other than as a patient responding to a physician questioning for prospective treatment[,]" the court of appeals held that her out-of-court statements to the doctor were wholly admissible.[47]

The first Eighth Circuit opinion dealing with the out-of-court statement of a child victim made to a non-physician, but nevertheless offered under Rule 803(4), is *United States v. DeNoyer*.[48] After he was abused by his father, the five-year-old victim was placed in a foster home and was interviewed by several social workers while he was there. Without any

---

[45]

*Id*. at 438-39.

[46]

*Id*. at 438.

[47]

*Id*. at 439.

[48]

811 F.2d 436 (8th Cir. 1987).

discussion of the fact that the social workers were not doctors, or that they had not even interviewed the child at the behest of any doctor, the Eighth Circuit merely cited *Renville* for the proposition that statements of child victims that identify the assailant may be reasonably pertinent to diagnosis or treatment, and therefore admissible under Rule 803(4), and affirmed the conviction.[49]  Over the next few years, the Eighth Circuit held "that statements about abuse, including the identity of the abuser, made by a child to a trained social worker or psychologist pursuant to diagnosis or treatment for emotional or psychological injuries are admissible under Rule 803(4)."[50]  These holdings are consistent with the position of the Advisory Committee that statements for the purpose of diagnosis and treatment need not necessarily be made to a physician.[51]  But they do not discuss whether the social workers, counselors, or psychologists made clear to the children the importance of telling the truth about the identity of their assailants, or whether the children manifested such an understanding, so as to satisfy the first part of the two-part test from *Iron Shell*, *viz.*, that the

---

[49]    *Id*. at 438.

[50]    *United States v. Balfany*, 965 F.2d 575, 581 (8th Cir. 1992), citing *United States v. Provost*, 875 F.2d 172, 176-77 (8th Cir. 1989) and *DeNoyer*, *supra*. *See also United States v. Yellow*, 18 F.3d 1438, 1442 (8th Cir. 1994); *United States v. Running Horse*, 175 F.3d 635, 638 (8th Cir. 1999).

[51]    FED. R. EVID. 803 (4) advisory committee notes ("Under the exception the statement need not have been made to a physician.  Statements to hospital attendants, ambulance drivers, or even members of the family might be included.").

declarant's motive is consistent with a purpose of facilitating diagnosis or treatment.[52]

More recent Eighth Circuit holdings, however, have returned to the explicit two-part test first announced in *Iron Shell* and elaborated on in *Renville*. These more recent holdings have emphasized the requirement that the record reflect, in cases involving child victims, both 1) that the physician (or counselor or psychologist) explained the importance of knowing the true identity of the assailant to the efficacy of the diagnosis or treatment and 2) that the child manifested an understanding of the need to be truthful. For example, in *Olesen v. Class*,[53] the court of appeals held that a physician's testimony that a five-year-old victim's statement identifying the defendant as her assailant was inadmissible. The doctor's testimony should not have been admitted, the court of appeals declared, because there was "no evidence in the record that he explained to [the victim] that his questions regarding the identity of her abuser were important to diagnosis or treatment, or that [the victim] . . . understood the medical significance of being truthful in identifying her abuser to her doctor."[54]

---

[52] The Eighth Circuit did not completely lose sight of this requirement. In *Ring v. Erikson*, 983 F.2d 818, 820 (8th Cir. 1992), the court of appeals held that the statement of a three-year-old victim to an examining physician was not pertinent to her diagnosis or treatment for purposes of Rule 803(4) because she was simply too young to grasp that she was talking to a doctor, and therefore could not be assumed to possess the self-interested motive necessary to guarantee trustworthiness. *See also United States v. White*, 11 F.3d 1446, 1450 (8th Cir. 1993) (statement made by nine-year-old declarant to social worker in an automobile did not satisfy Rule 803(4) hearsay exception where no explanation given to child by which he could have understood that interview conducted by a medical professional and was for purposes of medical diagnosis or treatment).

[53] 164 F.3d 1096 (8th Cir. 1999).

[54] *Id*. at 1098.

Similarly, in *United States v. Gabe*,[55] while acknowledging that a statement identifying an abuser may be admissible under Rule 803(4), the court of appeals held the physician's testimony in that case inadmissible because the Government, as proponent of the evidence, failed to satisfy the "rigorous standard" of *Renville* to show that the doctor explained to the child-victim the importance of that information to his diagnosis or treatment and that the child manifested an understanding of same.[56] Responding to the Government's argument that the fifteen-year-old victim was old enough to understand the importance of telling the truth to a medical care-giver, the court of appeals observed:

> We agree that most adults and older children generally understand a physician's role in providing diagnosis and treatment. But not even an adult necessarily understands the connection between a sex abuser's identity and her medical treatment. Rule 803(4) is premised on the patient's selfish motive in receiving proper medical treatment; therefore, the proponent must establish that the declarant's frame of mind when making the hearsay declaration "was that of a patient seeking medical treatment."[57]

The Eighth Circuit has recently applied the same "rigorous standard" in the context of out-of-court statements that child victims have made to psychologists and counselors.[58]

---

[55] 237 F.3d 954 (8th Cir. 2001).

[56] *Id*. at 958.

[57] *Id*., quoting *Oleson v. Class*, *supra*, at 1098.

[58] *United States v. Beaulieu*, 194 F.3d 918, 920-21 (8th Cir. 1999); *United States v. Sumner*, 204 F.3d 1182, 1185-86 (8th Cir. 2000); *United States v. Turning Bear*, 357 F.3d 730, 738-39 (8th Cir. 2004).

Other federal courts of appeals have determined that a child-victim's statement identifying her assailant to a treating or diagnosing doctor, psychologist, therapist, or counselor is admissible under Federal Rule 803(4). They have generally done so without resort to the "rigorous standard" that the Eighth Circuit applies; instead, they have found such child-victims—as a class—to be motivated to tell the truth, without inquiring about the particulars of the individual medical or therapeutic evaluation.[59] Indeed, the Tenth Circuit has expressly rejected the Eighth Circuit's two-part test as "not contemplated by the rule and . . . not necessary to ensure that the rule's purpose is carried out."[60] The Ninth Circuit has opined that the fact that a child may actually be too young to appreciate that her statements given for purposes of medical diagnosis or treatment should be truthful goes only to "the

---

[59] *E.g.*, *Morgan v. Foretich*, 846 F.2d 941, 949 (4th Cir. 1988) (categorically stating that "a young child will have the same motive to make true statements for purposes of diagnosis or treatment as an adult[,]" without inquiring whether circumstances showed that the child understood she was even being evaluated for purposes of diagnosis or treatment, much less whether she had been told the importance of truthfulness to the efficacy of the evaluation); *United States v. Norman*, 129 F.3d 1099, 1105 (10th Cir. 1997) (Rule 804(3) will apply to out-of-court statements of five-year-old victim without particularized inquiry whether child was old enough to appreciate the need to tell the truth to evaluating physician); *United States v. Pacheco*, 154 F.3d 1236, 1240-41 (10th Cir. 1998) (same); *United States v. Edward J.*, 224 F.3d 1216, 1219-20 (10th Cir. 2000) (same). *See also United States v. Kappell*, 418 F.3d 550, 557 (6th Cir. 2005) (in holding that psychologist could testify as to three-year-old and six-year-old victims' out-of-court statements made during evaluations by licensed psychotherapist, court of appeals observed that "[t]here is no evidence in the record–and Kappell has not cited any–that the children were not aware of the need to be truthful in their interviews with" the psychotherapist).

[60] *United States v. Joe*, 8 F.3d 1488, 1494 n.5 (10th Cir. 1993). *See also United States v. Edward J.*, *supra*, at 1220 n.3 ("Because we decline to accept the Eighth Circuit's presumptions, the government had no burden here to show the girls understood the medical importance of telling the truth.").

weight of the hearsay statements rather than their admissibility."[61]

## Texas Case Law

This Court has rarely construed Rule 803(4);[62] we have yet to speak to the questions raised in this petition. But a number of the courts of appeals have. The courts of appeals have long held that the witness relating an out-of-court statement made for the purpose of diagnosis or treatment need not be a physician for the statement to be admissible. The out-of-court statements of child-abuse victims identifying the perpetrator of the abuse to psychologists,[63] therapists,[64] licensed professional counselors,[65] and even, under some circumstances social workers,[66] have all been admitted into evidence under Rule 803(4)—so long as the statement at issue otherwise met the criteria of the rule.

The earliest Texas cases to address the criteria for admissibility of child-victim

---

[61]
*United States v. George*, 960 F.2d 97, 100 (9th Cir. 1992).

[62]
*See Garcia v. State*, 126 S.W.3d 921, 927 (Tex. Crim. App. 2004) (out-of-court statement to employee of battered women's shelter not admissible under Rule 803(4) because no indication that declarant was seeking medical treatment).

[63]
*Burns v. State*, 122 S.W.3d 434, 437-39 (Tex. App.—Houston [1st] 2003, pet. ref'd).

[64]
*Fleming v. State*, 819 S.W.2d 237, 243-44, 247 (Tex. App.—Austin 1991, pet. ref'd); *Gohring v. State*, 967 S.W.2d 459, 461 (Tex. App.—Beaumont 1998, no pet.).

[65]
*Wilder v. State*, 111 S.W.3d 249, 256-57 (Tex. App.—Texarkana 2003, pet. ref'd).

[66]
*Puderbaugh v. State*, 31 S.W.3d 683, 685 (Tex. App.—Beaumont 2000, pet. ref'd); *Horner v. State*, 129 S.W.3d 210, 217-220 (Tex. App.—Corpus Christi 2004, pet. ref'd). *But see Gohring v. State, supra*, at 462-63.

statements to treating physicians cited *Renville* for the proposition that out-of-court statements relating the identity of the assailant are "reasonably pertinent to diagnosis or treatment" in contemplation of Rule 803(4).[67] Without further discussion, each of these cases held that the statements were admissible. Thus, early Texas cases seemed to rely only on the second part of the two-part test from *Iron Shell*.[68] None of these early cases went on to inquire (as the Eighth Circuit did in *Renville*), as to the *first* part of the two-part *Iron Shell* test—whether the record showed that the child-victim had understood that she had made the statement for the *purpose* of diagnosis or treatment, or had been made aware of the

---

[67]
  *See Macias v. State*, 776 S.W.2d 255, 259 (Tex. App.—San Antonio 1989, pet. ref'd) (observing that Federal Rule 803(4) "has been interpreted to allow a physician to testify to a child's statements relevant to the external event causing an injury[,]" *citing, inter alia, United States v. Renville, supra*); *Tissier v. State*, 792 S.W.2d 120, 125 (Tex. App.—Houston [1st] 1990, pet. ref'd) (*citing United States v. Renville, supra*, for proposition that child statement identifying abuser as a member of her household was "reasonably pertinent to treatment" and hence admissible under Rule 803(4)); *Fleming v. State, supra*, at 247 (same); *Turner v. State*, 924 S.W.2d 180, 182 (Tex. App.—Eastland 1996, pet. ref'd) (*citing Fleming, supra*, and *Macias, supra*, for the proposition that "[s]tatements describing abusive acts are pertinent to medical diagnosis and treatment"); *Castoreno v. State*, 932 S.W.2d 597, 602 (Tex. App.—San Antonio 1996, pet. ref'd) (under *Macias, supra, Tissier, supra*, and *Renville, supra*, "the testimony of a child's treating physician concerning the child's statement that the defendant had caused his injuries was admissible as a hearsay exception under Rule 803(4)). *See also Mendoza v. State*, 69 S.W.3d 628, 633-34 (Tex. App.—Corpus Christi 2002, pet. ref'd) (*citing, inter alia, Tissier, supra*, in support of holding that child's out-of-court statement to nurse identifying defendant as her abuser was admissible under Rule 803(4); *Guzman v. State*, 253 S.W.3d 306, 308-09 (Tex. App.—Waco, no pet.) (citing *Tissier* to hold that statement of fourteen-year-old identifying the defendant as her abuser was "reasonably pertinent" to diagnosis or treatment).

[68]
  That is, first, whether the declarant's motive in making the out-of-court statement was consistent with the rationale underlying the rule, and, second, whether a physician or other treating professional would reasonably rely on that statement as information pertinent to diagnosis or treatment of the declarant. 633 F.2d at 84.

importance for that purpose of telling the truth about the identity of her assailant (where that fact is indeed pertinent to diagnosis or treatment).

A little later the courts of appeals did begin to pay some heed to the first part of the *Iron Shell* test. They began to recognize the need for a record that would establish that the child-victim appreciated that her statement was made for the express purpose of diagnosis or treatment.[69] Even so, the cases did not require, as the later Eighth Circuit cases do, that the record show that the physician, psychologist, counselor, etc., expressly informed the child that the purpose of her statements was to facilitate diagnosis or treatment, or that she manifested an understanding of that purpose. Especially with older children, so long as the record circumstantially supports an inference that the child understood the purpose of her statement, the courts of appeals have held that Rule 803(4) is satisfied.[70] Moreover, we have yet to find a Texas case that has addressed the specific question of whether, as a prerequisite

---

[69]

    *Gohring v. State*, *supra*, at 461; *Molina v. State*, 971 S.W.2d 676, 683-84 (Tex. App.—Houston [14th] 1998, pet. ref'd); *Beheler v. State*, 3 S.W.3d 182, 188-89 (Tex. App.—Fort Worth 1999, pet. ref'd); *Puderbaugh v. State*, *supra*, at 685; *Wilder v. State*, *supra*, at 256-57; *Horner v. State*, *supra*, at 219; *Barnes v. State*, 165 S.W.3d 75, 82-83 (Tex. App.—Austin 2005, no pet.).

[70]

    Conversely, courts of appeals in Texas have occasionally held out-of-court statements from child-victims to be inadmissible under Rule 803(4) because there was no reason to believe that the child would (or even could) have appreciated that the purpose of the statement was to facilitate diagnosis or treatment. *E.g.*, *Gohring v. State*, *supra*, at 462-63 (even assuming that investigating Child Protective Services social worker was engaged in diagnosis or treatment of declarant (a dubious proposition in the court's view), "it would not be reasonable" in that context "to assume the child would be aware" of it unless explicitly told so); *Powell v. State*, 88 S.W.3d 794, 800 (Tex. App.—El Paso 2002, no pet.) (3-year-old child was too young to justify "the presumption of reliability that forms the basis for the Rule 803(4) exception" because he could not possibly comprehend "the need to be truthful" even in the context of medical diagnosis or treatment).

to admitting a child-victim's out-of-court statement *that identifies her assailant*, the record must show that she was specifically informed by her physician (or psychologist or counselor), and manifested an understanding, of the importance of *that particular information* to her diagnosis or treatment.

The Austin Court of Appeals has taken a somewhat narrower view of Rule 803(4) than have other Texas courts of appeals. In *Moore v. State*,[71] two teenage sexual-assault victims began therapy sessions with a licensed clinical psychotherapist/social worker within weeks of their outcry.[72] They remained in therapy, once or twice a week, sometimes individually and sometimes in a group, right up to the time of trial.[73] The court of appeals held that the therapist's testimony of statements made by the two girls describing specific instances of abuse was inadmissible under Rule 803(4) because the State did not carry its burden to demonstrate that the therapist was engaged in medical diagnosis or treatment. The court reasoned that "to ensure that the medical treatment exception's assumption that patients seeking medical care will be honest and truthful in relaying symptoms in order to obtain proper and effective treatment remains intact, the offered witness's qualifications must be

---

[71] 82 S.W.3d 399 (Tex. App.—Austin 2002, pet. ref'd).

[72] *Id*. at 403-05.

[73] *Id*.

shown to conform to the rule."[74]  But "[b]ecause the record does not have sufficient information for us to determine that [the therapist] has received medical training and can qualify as a member of the medical profession," the court of appeals held that Rule 803(4) was not satisfied.[75]

In a separate, concurring opinion in *Moore*, Justice Patterson expressed the view that the statements in issue were also inadmissible for a different reason.[76]  Pointing out that the statements had been made in the context of on-going, long-term therapy occurring years after the offenses alleged, she argued that there was no reason to believe that the assumption underlying the rule would still apply "or that [the victims'] frame of mind was comparable to a patient seeking treatment."[77]  In *Jones v. State*,[78] writing for a majority, Justice Patterson elevated the view she expressed in *Moore* to a holding of the court, reasoning that the selfish motive to tell the truth "is no longer present once a diagnosis has been made and treatment has begun.  The details a patient may report during an extended course of treatment may be prompted by other motives, such as denial or deception, or be influenced by the treatment

---

[74] *Id*. at 404.

[75] *Id*. at 405.

[76] *Id*. at 409-16.

[77] *Id*. at 414.

[78] 92 S.W.3d 619 (Tex. App.—Austin 2002, no pet.).

process itself."[79] Accordingly, the court of appeals held that the statements made by the nine-year-old complainant to a licensed professional counselor over the course of a ten-month period of therapy, continuing up to the time of trial, were inadmissible.

Soon the Austin Court would consolidate the holdings of *Moore* and *Jones*, in *Perez v. State*.[80] There, the twelve-year-old declarant began therapy with a licensed professional counselor nine months after her initial outcry.[81] The counselor was not licensed to practice medicine and was not working under the supervision of a physician or psychologist.[82] The court of appeals held that the trial court erred in admitting the declarant's hearsay statements to the counselor both because the counselor was "not shown to be a medical professional," and because "the statements were made during an extended period of counseling and did not possess the guarantees of the trustworthiness on which the medical diagnosis and treatment exception to the hearsay rule is founded."[83] Not surprisingly, it is these three cases from the Austin Court of Appeals that the appellant in this case relies upon most prominently.

---

[79] *Id*. at 623.

[80] 113 S.W.3d 819 (Tex. App.—Austin 2003, no pet.).

[81] *Id*. at 828

[82] *Id*. at 830.

[83] *Id*. at 827.

**ANALYSIS**

Based upon the Austin Court of Appeals cases, the appellant argues that Volet's testimony relating the details of what J.B. told her in therapy sessions was inadmissible for two reasons. First, Volet's qualifications as a medical professional were not shown to "conform to the rule."[84] Second, because the therapy sessions occurred at least several months after the charged offense, any statements J.B. made in that context lack the guarantees of trustworthiness that otherwise undergird the hearsay exception. We reject the appellant's first argument as contrary to the intent of the drafters and the weight of persuasive case authority. But, at least on the facts of this case, we agree with the appellant with respect to his second argument.

**Medical Qualifications?**

We reject the notion, implicit in the Austin Court's holdings, that before a witness can relate the out-of-court statement made for purposes of medical diagnosis or treatment under Rule 803(4), the witness must be shown to have medical "qualifications" that "conform to the rule."[85] It is clear that the drafters of the federal rule did not think so, for they expressly designated that in order for the exception to apply "the statement need not have been made

---

[84] *Moore v. State*, *supra*, at 404.

[85] *Id*.

to a physician."[86] Indeed, "[s]tatements to hospital attendants, ambulance drivers, or even members of the family might be included."[87] Certainly a family member will not typically have any "qualifications" in the medical profession. The essential "qualification" expressed in the rule is that the declarant believe that the information he conveys will ultimately be utilized in diagnosis or treatment of a condition from which the declarant is suffering, so that his selfish motive for truthfulness can be trusted. That the witness may be a medical professional, or somehow associated with a medical professional, is no more than a circumstance tending to demonstrate that the declarant's purpose was in fact to obtain medical help for himself. A declarant's statement made to a non-medical professional under circumstances that show he expects or hopes it will be relayed to a medical professional as pertinent to the declarant's diagnosis or treatment would be admissible under the rule, even though the direct recipient of the statement is not a medical professional.[88] To the extent that

---

[86] FED. R. EVID. 803(4) advisory committee notes.

[87] *Id*.

[88] This is to be distinguished from the scenario under which the declarant is a parent of a child who relays to a medical professional for purposes of diagnosis or treatment what the child has told him. *See, e.g., Sandoval v. State*, 52 S.W.3d 851, 855-57 (Tex. App.—Houston [1ˢᵗ] 2001, pet. ref'd), and federal cases cited therein. Certainly parents who convey information to a doctor for purposes of treating their child will have a compelling (albeit not wholly selfish) motive to tell the truth. To the extent they have first-hand knowledge of, e.g., the child's medical history, there is no reason their out-of-court statements should not be admissible under the rule. On the other hand, if they are only relating, e.g., the cause of an injury as they themselves have been told by the child, it is arguable that the hearsay exception should not apply. For while there is no reason to question the truth-telling motive of the parents, the child's statement to the parents may not have been made with the intention (or even an awareness) that it would be passed on to a medical professional for

*Moore* and *Perez* may be read to hold otherwise, we expressly overrule them.

Here, J.B. did not make her statements to Volet with the understanding that Volet would relay them to a medical doctor. But we do not regard it as absolutely essential under the rule that the ultimate diagnosing or treating entity be a *physician*, or that the statement be made for purposes of diagnosing or treating a strictly *physical* ailment. As it has been universally recognized since the Eighth Circuit first addressed the issue in *Renville*, the medical community "must be attentive to treating the emotional and psychological injuries which accompany" crimes against children.[89] A statement made for the purpose of facilitating a child-declarant's own mental health may carry the same self-interested motive as a statement made to facilitate the declarant's physical well-being. If so, there is no reason to exclude it from Rule 803(4)'s ambit, regardless of whether the care-giver is a psychiatrist (and hence, a physician) or some other trained mental-health professional.

Of course, there may be other considerations to take into account in the case of a statement made for purposes of mental-health diagnosis or treatment. For example, the declarant's mental illness or disorder must not be of such a nature or degree as to disable him from appreciating his own self-interest in telling the truth to his care-giver. This is so both for purposes of diagnosis and treatment. Moreover, and especially in the context of mental-

---

purposes of diagnosis or treatment. Under those circumstances, the initial declarant of the hearsay-within-hearsay statement may not have shared the selfish motive essential to guarantee its trustworthiness.

[89] 779 F.2d at 437.

health treatment (as opposed to diagnosis), it must be the case that truth-telling is important to the efficacious treatment of the mental illness or disorder, and that the declarant has an awareness (and is competent to appreciate the fact) that truth-telling is important. The focus, in short, is on the declarant's perception. If a child-declarant can and does believe that his statement to a mental-health professional will facilitate his diagnosis or treatment, we think that his out-of-court statement should be admissible under Rule 803(4), whether or not the mental-health professional is, strictly speaking, a member of the "medical profession."[90] Again, to the extent that the opinions of the Austin Court of Appeals can be read to the contrary, we overrule them.

J.B. testified that she was in therapy for post-traumatic-stress disorder (PTSD), a recognized mental disorder.[91] Volet, a licensed professional counselor with extensive experience counseling sexual-abuse victims, testified that J.B. had been referred to her for help in resolving certain psychological issues attendant to the sexual assault. So long as J.B.'s out-of-court statement to Volet implicating the appellant in the sexual assault otherwise satisfies the two-part test of *Iron Shell/Renville*, we do not think that it should be inadmissible simply because Volet is not a psychiatrist or otherwise a member of the medical profession. However, we do not think that the State, as proponent of the hearsay evidence,

---

[90] *See Moore v. State*, *supra*, at 405.

[91] *See* AMERICAN PSYCHIATRIC ASSOCIATION DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS (Text Revision, 4th ed. 2000) at 463.

has ultimately met its burden in demonstrating that J.B.'s out-of-court statements to Volet identifying the appellant as the perpetrator of her sexual assault do satisfy the *Iron Shell/Renville* test.

### Made for Purposes of Diagnosis or Treatment?

We agree with the Austin Court of Appeals that, consistent with the rationale for admitting statements made for purposes of medical diagnosis or treatment over a hearsay objection, it is appropriate to require the proponent of the evidence to show that the out-of-court declarant was aware that the statements were made for that purpose and that "proper diagnosis or treatment depends upon the veracity of such statements."[92] This is the first part of the *Iron Shell/Renville* test. Absent such an awareness on the declarant's part, we cannot be sure that the self-interested motive to tell the truth, making such statements sufficiently trustworthy to overcome a hearsay objection, is present.

We disagree with the Austin Court, however, to the extent that it has held that such a self-interested motive "is no longer present once a diagnosis has been made and treatment has begun."[93] This is too categorical. It is inconsistent with the plain language of the rule, which admits hearsay made for the purpose of "diagnosis or treatment," not "diagnosis or determining a course of treatment," or "diagnosis or devising a treatment plan." Moreover, the motive for self-preservation that fuels the hearsay exception does not necessarily

---

[92] *Jones v. State*, *supra*, at 623.

[93] *Id*.

extinguish once a course of treatment has been determined and has commenced. The effectiveness of on-going treatment, and especially of mental-health treatment, we have no doubt, will at least sometimes depend, in some particulars, upon the patient's veracity. When that is the case, and so long as the patient can be made to understand that dependency, there is little reason to question his motive to be truthful in the interest of improving his own mental health.[94]

Still, we recognize that reclining on a therapist's or psychiatrist's couch is not quite the same as sitting in the emergency room in the immediate aftermath of an injury or on the physician's cold examination table in the interest of diagnosing and curing some exigent disease or ailment. In the latter contexts, it seems only natural to presume that adults, and even children of a sufficient age or apparent maturity, will have an implicit awareness that the doctor's questions are designed to elicit accurate information and that veracity will serve their best interest. This explains the almost universal tendency of courts under these circumstances to assay the record, not for evidence of such an awareness, but for any evidence that would *negate* such an awareness, even while recognizing that the burden is on the proponent of the hearsay to show that the Rule 803(4) exception applies.[95]

---

[94] Again, this assumes that the declarant's mental illness or disorder does not itself impair his ability to appreciate the need for veracity with his care-giver.

[95] Even the earliest cases did not hesitate to infer such an awareness from the circumstances. *See United States v. Iron Shell*, *supra*, at 84 ("We find no facts in the record to indicate that [the nine-year-old child-declarant's] motive in making these statements was other than as a patient seeking treatment. * * * There is nothing in the content of the statements to suggest that [the child]

In the therapist's office, however, this tacit presumption is far less compelling. It is not always so readily apparent (indeed, it may not always be *accurate*) in the mental-health context that truth-telling is vital. Not even an older, more mature child (maybe not even an

---

was responding to the doctor's questions for any reason other than promoting treatment."); *United States v. Renville*, *supra*, at 439 ("Nothing in the record indicates that the [eleven-year-old] child's motive in making these statements was other than as a patient responding to a physician questioning for prospective treatment."). *See also Morgan v. Foretich*, *supra*, at 949 (categorically stating that "a young child will have the same motive to make true statements for purposes of diagnosis or treatment as an adult[,]" even though concurring and dissenting opinion complained that there was "no evidence in the record that her frame of mind was comparable to a patient seeking treatment"); *United States v. Tome*, *supra*, at 1457 (Holloway, J., concurring and dissenting) (complaining that there was no record showing that very young child-declarant understood that the efficacy of her medical treatment depended upon the accuracy of the information she provided); *United States v. Norman T.*, *supra*, at 1105 ("Norman T. also fails to point to any actual evidence in this case to show specifically this victim did not understand she was seeking medical treatment."); *United States v. Pacheco*, *supra*, at 1241 ("Pacheco has not pointed to any actual evidence indicating that [five-year-old child-declarant] did not understand she was being examined by doctors and needed to be truthful in her discussions with them."); *United States v. Edwards*, *supra*, at 1220 n.3 ("Edwards fails to point to any evidence in the record tending to show the girls did not understand they were seeking medical treatment, or the importance of being truthful when talking to a doctor."); *United States v. Kappell*, *supra*, at 557 (even though psychotherapist had explained to children the need to be truthful and followed protocol to make sure they understood, court of appeals nevertheless observes that "[t]here is no evidence in the record—and Kappell has not cited any—that the children were not aware of the need to be truthful in their interviews" with him).

Texas cases have been equally quick to infer the requisite awareness under the circumstances. *E.g.*, *Gohring v. State*, *supra*, at 463 (ordinarily it is reasonable to "assume" that child will understand that a statement given to a "recognized health professional, such as a physician, nurse, psychologist, or mental health therapist" will be for purpose of medical diagnosis or treatment); *Beheler v. State*, *supra*, at 188 ("there is no requirement that a witness expressly state that the hearsay declarant recognized the need to be truthful in her statements for the medical exception to apply[,]" even if that declarant is a child); *Wilder v. State*, *supra*, at 257 ("reasonable to infer" under the circumstances that nine-year-old declarant understood her statements to therapist were for purposes of medical treatment); *Horner v. State*, *supra*, at 220 (trial court could have found that statement that eight-year-old child gave to "medical social worker" in same suite as diagnosing physician "appreciated that the effectiveness of the treatment depended on the accuracy of the information she provided"); *Barnes v. State*, *supra*, at 83 (because she was ten years old, and mature enough "to be interviewed outside her grandmother's presence," trial court could have found that child-declarant understood the need to be truthful in statements made to physician).

adult) will necessarily recognize and appreciate the necessity (assuming there is a necessity) always to tell a mental-health provider the truth in order to assure the efficacy of treatment.[96] In this context we think it is incumbent upon the proponent of the hearsay exception to make the record reflect both 1) that truth-telling was a vital component of the particular course of therapy or treatment involved, and 2) that it is readily apparent that the child-declarant was aware that this was the case. Otherwise, the justification for admitting the out-of-court statement over a valid hearsay objection is simply too tenuous.

### Pertinent to Diagnosis or Treatment?

The Austin Court of Appeals was also correct to say that not every statement made in the course of mental-health treatment will be admissible just because they are likely to be truthful.[97] By the express terms of Rule 803(4), as elaborated by the second part of the *Iron Shell*/*Renville* test, the proponent of hearsay evidence must show that the particular statement

---

[96] In his concurring opinion, Judge Womack asks the rhetorical question whether it would be more important in an emergency-room situation for a thirteen-year-old victim of a stabbing or a thirteen-year-old victim of sexual abuse to tell her health care provider the truth about the identity of the perpetrator. Obviously it would be more important for the sexual abuse victim to tell the truth. (Indeed, a statement about the perpetrator of the stabbing would not even be admissible under the hearsay exception for statements made for purposes of medical diagnosis or treatment because, as we have noted previously, statements of "fault" in that context do not ordinarily fit the exception. *See* note 37, *ante*.) But the relevant question is not which victim's treatment would be best facilitated by truthful identification of the perpetrator, but whether the latter victim would be likely *to realize and understand* the importance to proper diagnosis and treatment of being truthful to her health care provider about the identity of the perpetrator.

[97] *Jones v. State*, *supra*, at 623 (medical diagnosis or treatment exception does not "encompass every statement made by a child victim of sexual abuse to a therpist").

proffered is also "pertinent to . . . treatment,"[98]—that is to say, that it was reasonable for the therapist to rely on the particular information contained in the statement in treating the declarant.[99] This includes showing that a statement from a child-declarant revealing the identity of the perpetrator of sexual abuse is pertinent. In *Renville*, the Eighth Circuit made it clear that this information might be pertinent because it is important for a physician to discover the extent of the child's "emotional and psychological injuries"—particularly when the perpetrator might be a family or household member and it is important to remove the child from the abusive environment.[100]

It is far less obvious how that information will necessarily be pertinent, long after the fact of the abuse, in an on-going course of mental-health treatment or therapy. At that point, knowing who is at fault for the emotional or psychological trauma may not be critical to every treatment plan, especially if the perpetrator was not a family or household member. We think it is appropriate, therefore, to require that the proponent of the hearsay exception make the record reflect that it was important to the efficacy of the treatment that the mental-health professional know the identity of the perpetrator. Moreover, returning to the first part of the *Iron Shell/Renville* test, we also think it is appropriate, at least in the context of long-

---

[98] TEX. R. EVID. 803(4).

[99] *United States v. Iron Shell*, *supra*, at 84.

[100] 779 F.2d at 438.

term, on-going, after-the-fact mental-health treatment, that the proponent should make it readily apparent on the record 1) that it was important to the efficacy of the treatment (if, in fact, it *was* important) for the child-declarant to disclose the true identity of the perpetrator and 2) that the child, prior to the disclosure, understood that importance.[101]  In this way we avoid the categorical approach adopted by the Austin Court of Appeals in this context, but are still assured that the rationale underlying the Rule 803(4) hearsay exception will be vindicated.

**Conclusion**

Volet testified that she was counseling J.B. to help her deal with the psychological aftermath of "the rape and the sexual assault."  She was also attempting to help J.B. cope with the anger she felt towards her mother and not let that anger adversely affect her behavior and judgment.  The appellant was not a family or household member—he was, in fact, barely more than a stranger to J.B.  It is not readily apparent that knowing the appellant's identity was pertinent to Volet's treatment of J.B. for the trauma of the sexual assault, and it seems unlikely to have aided Volet in any material way in treating the residual anger issues that J.B.

---

[101]

From the outset, part of the Eighth Circuit's "rigorous standard" required a showing that a child-declarant was made aware of the importance of information about the identity of the perpetrator. *United States v. Renville*, *supra*, at 438.  While the Eighth Circuit has sometimes lost sight of this requirement, more recent Eighth Circuit cases have acknowledged and implemented it. *See Olesen v. Class*, *supra*, at 1098; *United States v. Gabe*, *supra*, at 958; *United States v. Turning Bear*, *supra* at 738.  Whether this "rigorous standard" should apply to child-declarants generally in Texas is a question not presented on the facts of this case, and we need not decide it.  But, for reasons given in the text, we do think it appropriate to apply it at least in the context of a child-declarant's long-term, on-going, after-the-fact mental-health therapy.

had with her mother. This is not to say that Volet could not have testified to establish that appellant's identity was pertinent to J.B.'s treatment in a way that is not obvious to us. But she was never asked to do so during her testimony, and it is not otherwise apparent on the record how it might be pertinent. Moreover, there is nothing in this record that makes it readily apparent that J.B. understood that truthfulness about the identity of her assailant was important to the efficacy of her treatment for these issues. We cannot presume these predicate facts without effectively relieving the proponent of the hearsay evidence (here, the State) of its burden to establish the existence of a valid exception to the hearsay rule. On this state of the record, we conclude that the trial court abused its discretion to admit Volet's testimony of J.B.'s out-of-court declarations, at least to the extent that they identified the appellant as the perpetrator.

## HARM ANALYSIS

Ordinarily, having found error for the first time in a petition for discretionary review, we would remand a case to the lower appellate court to conduct a harm analysis in the first instance. But this is not an absolute rule.[102] In his concurring opinion below, Justice Jennings expressed the view that the trial court erred in admitting Volet's testimony, but that

---

[102]

*Johnston v. State*, 145 S.W.3d 215, 224 (Tex. Crim. App. 2004); *McDonald v. State*, 179 S.W.3d 571, 579-80 (Tex. Crim. App. 2005) (Cochran, J., concurring). *See also* George E. Dix & Robert O. Dawson, 43A TEXAS PRACTICE: CRIMINAL PRACTICE AND PROCEDURE § 44.80 (2nd ed.., Supp. 2007-2008), at 374-75.

the error was harmless.[103] The parties have briefed the question of harm in this Court, and we think that Justice Jennings's conclusion that the error was harmless is sufficiently clear-cut on the instant record that it would constitute a needless expenditure of judicial resources to remand the cause.

The error here is not of constitutional dimension. The appropriate harm analysis is therefore the one set out in Rule 44.2(b) of the Texas Rules of Appellate Procedure, which dictates that a non-constitutional error "that does not affect substantial rights must be disregarded."[104] We have construed this to mean that an error is reversible only when it has a substantial and injurious effect or influence in determining the jury's verdict.[105] We should not overturn the conviction if we have fair assurance from an examination of the record as a whole that the error did not influence the jury, or had but slight effect.[106] Here we believe the error in allowing Volet's testimony would have had but slight effect.

The appellant argues that Volet's testimony would have influenced the jury because it provided the only corroboration for J.B.'s testimony implicating him, and the prosecutor emphasized this fact during his final summation at the guilt phase. The prosecutor argued:

---

[103] *Taylor v. State*, *supra*, at *10-*11.

[104] TEX. R. APP. P. 44.2(b).

[105] *King v. State*, 953 S.W.2d 266, 271 (Tex. Crim. App. 1997).

[106] *Johnson v. State*, 967 S.W.2d 410, 417 (Tex. Crim. App. 1998).

Let's talk about the factors that weigh in favor of [J.B.'s] credibility.

One, just the story she told you from the stand itself. Very detailed. Very long. And she has told this story over and over again when she was interviewed at the Children's Assessment Center in Fort Bend County, to CPS, to law enforcement, to her therapist. Every opportunity to get tripped up in a lie. If she had changed that story you would have heard about it. She would have been impeached with it. She was not. The reason that 13 year old child was able to get on that stand and talk about those events so matter of factly like she did is because truth is easier to tell. Lies are difficult . . .

\* \* \*

You heard from her therapist. She has been seeing a therapist for months now to deal with the post traumatic stress disorder. She shows the signs and symptoms of a child who has been sexually abused . . .

\* \* \*

Now, her therapist says she shows all the signs. She was consistent with her therapist about what happened . . .

With respect to this final argument, Justice Jennings observed:

The State, in arguing about "the factors that weigh[ed] in favor" of the complainant's credibility, did mention that the jury "heard from" the complainant's therapist and that the complainant had not changed her "story." However, the State explained that the complainant told her version of events "over and over again" to different agencies, "law enforcement," and the jury itself. The State's point was that if the complainant had changed her story, the jury would have "heard about it" and her testimony would "have been impeached." Moreover, the State also argued that Volet testified that the complainant showed "the signs and symptoms of a child who has been sexually abused," and this evidence is generally admissible if supported by reliable expert testimony. *See Hernandez v. State*, 53 S.W.3d 742, 751 (Tex. App.—Houston [1ˢᵗ Dist.] 2001, pet. ref'd).[107]

---

[107]

*Taylor v. State*, *supra*, at \*11. There was no direct evidence at trial that J.B. told her story "over and over again" to different state agencies and law enforcement, although the jury might

On the basis of these observations, Justice Jennings concluded that the trial court's error in admitting the objectionable portion of Volet's testimony did not have a substantial and injurious effect or influence on the jury in reaching its verdict. We agree that the error would have had but slight effect, and on that basis we hold that the error was harmless.

Accordingly, we affirm the judgment of the court of appeals.


Delivered:    October 29, 2008
Publish

---

reasonably have inferred it. In any event, the appellant did not object to the prosecutor's final argument on this basis. Although the appellant did object to Volet's testimony that J.B. displayed some of the characteristics common to children who have suffered sexual abuse, the trial court overruled the objection and the appellant did not press the matter on appeal. *See* note 11, *ante*.