**Opinion issued December 31, 2018**



In The

# Court of Appeals

For The

# First District of Texas

_____

## NO. 01-17-00571-CR

_____

**TALAWRENCE DONYEA TENNELL, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

---

**On Appeal from the 85th District Court**
**Brazos County, Texas**
**Trial Court Case No. 15-01993-CRF-85\*†**

---

\*   Under its docket-equalization authority, the Supreme Court of Texas transferred this appeal from the Court of Appeals for the Tenth District to this Court. *See* Misc. Docket No. 17–9066, Transfer of Cases from Courts of Appeals (Tex. June 20, 2017); *see also* TEX. GOV'T CODE § 73.001 (authorizing transfer of cases). We are unaware of any conflict between precedent of that court and that of this court on any relevant issue. *See* TEX. R. APP. P. 41.3.

†   We deny appellant's motion for rehearing. We withdraw our memorandum opinion dated August 30, 2018 and issue this substitute opinion.

# MEMORANDUM OPINION

A jury found appellant Talawrence Donyea Tennell guilty of capital murder in the death of a seven-month-old baby. *See* TEX. PENAL CODE § 19.03(a)(8). The court sentenced him to life in prison, without the possibility of parole. *See id.* §§ 19.03(b), 12.31(a)(2). Tennell filed a motion for new trial alleging that the State failed to disclose exculpatory evidence before trial and that the same evidence entitled him to a new trial. After a hearing, the trial court denied the motion.

On appeal, Tennell reurges the grounds for his motion for new trial. He also contends that the trial court erred by admitting evidence over his hearsay objection and by denying his request for an instruction on the lesser-included offense of manslaughter.

We conclude that Tennell waived his hearsay objection and that he has failed to show that he was entitled to a jury instruction on manslaughter. He also has failed to prove that the State withheld exculpatory evidence or that his failure to discover the evidence at issue was not caused by his own lack of diligence. To the extent he has attempted to raise constitutional arguments on appeal, they have been waived. Accordingly, we affirm the trial court's judgment.

## Background

Appellant Talawrence Donyea Tennell lived with his girlfriend Crystal Harris. Two children lived with them, Harris's seven-month-old daughter, Hailey, and her five-year-old daughter, Riley.

One afternoon, Harris left Hailey at home under Tennell's care. When Harris returned home approximately two hours later, Tennell was holding Hailey. The baby was unresponsive, and her forehead was bruised. Harris attempted CPR and called 911. An ambulance responded, and Hailey was transported to a hospital where she was pronounced dead. Her cause of death was determined to be blunt-force injuries.

That evening, detectives of the Bryan Police Department interviewed Tennell. The report of the interview stated that Tennell told them that the previous evening, a plastic mouthwash bottle containing liquid PCP (phencyclidine) had burst in his pants pocket while he was riding in a friend's car, and he threw the bottle out of the car window. He claimed that the drug contacted his skin, and he started to "trip" from it. He awoke the next morning around 9:00 a.m. to go to a junkyard with his brother-in-law to look for a part, and then he returned home and fell asleep. Around 1:00 p.m., Harris woke him to tell him that she was leaving to get her older daughter from school and take her to an eye doctor.

Tennell told the detectives that Hailey was sleeping when Harris left and that subsequently he fell asleep again. According to his statement, some time later he heard Hailey crying, and he put her pacifier back in her mouth and fell back asleep. When he awoke, Hailey was on the floor and was not making any noise. He picked her up and held her until Harris returned. He stated he made no attempt to notify anybody what had happened.

Tennell was arrested and charged with Hailey's murder. He was taken to the hospital, had blood drawn for a drug test, and later was booked at the Brazos County Jail. He was indicted on counts of capital murder, felony murder, and injury to a child. He pleaded not guilty, and the case proceeded to trial. Tennell's defensive theory was that he was extremely intoxicated when he killed Hailey due to transdermal absorption of a large dose of PCP that had leaked through his jeans.

At trial Harris testified that the day before Hailey's death, she and Tennell had had an argument over his phone contact with an ex-girlfriend. She confronted him and told him to leave. Tennell collected his clothes, and she took him to a motel. Shortly thereafter, they spoke on the phone and decided that Tennell could return to the house and they would discuss it. Tennell returned with his clothes around 10:00 p.m., and they talked. Tennell decided that he wanted to continue their relationship. Harris testified that Tennell's behavior was normal when he returned home that evening before Hailey's death, and after he took a shower, they went to bed, with Hailey sleeping with them on their bed.

Harris testified that the next morning, she took her older daughter to school, picked up her niece, and returned home. Tennell and Hailey were still in bed, and nothing had raised Harris's suspicion at that time. Tennell soon got up, took a shower, and got dressed. He left to go to a junkyard with Harris's brother-in-law. While he was gone, Harris fed Hailey and they both fell asleep. When Tennell

4

returned, he woke Harris and reminded her that she needed to get her older daughter at school and take her to her eye doctor appointment.

When Harris left that afternoon to take her older daughter to the eye doctor, Hailey was in the adults' bedroom. Upon her return approximately two hours later, Tennell was in the bedroom, holding Hailey. There was blood on his shirt, and Hailey was unresponsive. Harris repeatedly asked Tennell what had happened, but he did not respond. She stated that he "didn't look normal."

During cross-examination, defense counsel asked Harris whether she had ever seen or smelled PCP in her apartment while Tennell was there, whether she smelled PCP on his pants the night before Hailey's death, and whether she was aware that he sold drugs. Harris stated that she was familiar with the smell of PCP from a prior relationship, but she had never smelled or seen PCP in her apartment while Tennell was there, including the night before and the day of Hailey's death.

Officer R. Snell was one of the first officers to arrive at Harris's apartment. He testified that he spoke with Tennell, who claimed that Hailey had fallen off the bed while sleeping. Tennell had difficulty answering questions, and Snell believed he was under the influence of "some type of substance." Snell smelled PCP at the residence, and he recovered a travel-sized mouthwash bottle from the bottom of the steps outside of the apartment. The bottle contained tobacco leaves, which Snell testified was consistent with a common method of smoking PCP. The bottle tested positive for PCP.

5

The emergency physician who treated Hailey and the assistant medical examiner who performed the autopsy each testified. Hailey had sustained various fractures to her body and numerous fractures to her skull. Both witnesses believed that Hailey's injuries were not consistent with an accidental fall, but instead had been inflicted intentionally by a person.

A crime-scene investigator testified that she collected a pair of folded blue jeans from behind the front door of the apartment. The jeans were admitted into evidence. A swatch cut from the jeans tested positive for PCP.

A trained paramedic working in the medical jail division of the Brazos County Sheriff's office testified that her job was to assess the mental and physical status of inmates upon their arrival at the jail. Medical intake was done for every booked inmate and included the completion of an "Initial Inmate Medical Interview" form. The form had spaces for the inmate's identifying information, and it included questions about medical history, allergies, prescribed medicine, and history of drug and alcohol use and treatment. The paramedic testified that the purpose of the interview was to ascertain the inmate's medical issues and to better treat the inmate in case "something happened in the jail."

The paramedic completed Tennell's medical interview form when he arrived at the Brazos County Jail on the evening of Hailey's death. Tennell admitted that he used PCP. The paramedic testified that when inmates admitted to drug use, she asked follow-up questions to determine whether an inmate would "detox," and

whether there might be behavioral issues due to the drug use. When the paramedic asked follow-up questions about Tennell's drug use, he said that he had been smoking PCP since the beginning of the year, he smoked "a lot" each day, and he had last smoked PCP that same day. He further stated: "[I] probably have a lot of PCP in my system." The paramedic recorded Tennell's responses on the medical interview form, which was admitted into evidence over a hearsay objection. Blood samples drawn from Tennell hours after Hailey's death were positive for the presence of PCP.

The defense presented testimony from Dr. Mansoor Khan, an expert in pharmaceutical science with a specialization in drug delivery systems. He testified that based on his review of literature discussing the molecular structure of PCP and his knowledge of transdermal absorption, there is a "very high possibility" that the substance could permeate through the skin. He further explained that side effects of high dosages of PCP could include disassociation, agitation, violence, coma, memory loss, and death.

The lead investigator in the case, Detective S. Davis of the Bryan Police Department, was not called to testify by either side. Thus the jury never heard about Tennell's statement to Davis that he had spilled PCP on his pants the night before Hailey's death. During trial, Tennell put on the jeans that had been offered into evidence to demonstrate to the jury that they were his.

7

At the close of evidence, the trial court presented the parties a proposed jury charge that included instructions on capital murder and the lesser-included offense of felony murder based on the underlying offense of reckless injury to a child. Tennell asked the court to include instructions on the lesser-included offenses of manslaughter, criminally negligent homicide, and felony murder based on the underlying offense of possession of a controlled substance. The court denied the requests. The trial court also denied Tennell's request for an instruction on involuntary intoxication.

During closing arguments, the State argued that Tennell "wanted [Hailey] dead" and that he had intentionally killed her. Tennell's counsel argued that the State had not proved its case beyond a reasonable doubt. Tennell's counsel also argued that PCP had been absorbed into his skin through the jeans, which were in evidence. The State objected to the argument, arguing that there had been no trial evidence of transdermal absorption through the jeans or that Tennell had worn them on the day of the murder. The court overruled the objection.

Tennell's counsel argued that because Tennell was a "PCP addict," he knew how PCP affected him. But "something different happened the day Hailey died"; Tennell took a larger dose of PCP than he ever had before, and that dose "could have" come from the PCP on the jeans. Defense counsel showed the jeans to the jury and argued that when they were collected, the jeans "had a huge wet stain" from the PCP. Counsel argued that the smell of PCP was still present on the jeans

at the time of trial and that she found it "impossible to believe" that Harris had no idea that Tennell used and dealt drugs. Counsel asked, "How is it that other witnesses who are walking into that house for the very first time immediately smell PCP, . . . and she couldn't?" Counsel argued that rather than Tennell being "totally normal" when Harris left the apartment, it made more sense that "he was already stoned out of his gourd."

The jury found Tennell guilty of capital murder and that he had used a deadly weapon to commit the offense. He was automatically sentenced to life in prison. Tennell filed a motion for new trial, alleging that the State withheld evidence that Harris saw him wearing the PCP-stained jeans before she left Hailey at the apartment under his care on the day of her death. After a hearing, the trial court denied the motion for new trial. Tennell appeals.

## Analysis

Tennell raises two issues relating to events during the trial—the admission of hearsay evidence and the denial of a jury instruction about a lesser-included offense. We address these issues first. We then consider issues relating to Tennell's motion for new trial and the allegation that the prosecution withheld evidence. Finally we address the waiver of two issues attempting to challenge the conviction with constitutional arguments made for the first time on appeal.

## I. Medical intake interview form as hearsay

Tennell argues that the trial court erred by admitting, over his objections, a page from his medical interview form completed upon his admittance to the Brazos County Jail. Trial courts have broad discretion to determine the admissibility of evidence, and we will find error only upon a showing of a clear abuse of discretion. *Montgomery v. State*, 810 S.W.2d 372, 378–79 (Tex. Crim. App. 1990); *Roberts v. State*, 29 S.W.3d 596, 600 (Tex. App.—Houston [1st Dist.] 2000, pet. ref'd). As long as the trial court's ruling was within the "zone of reasonable disagreement," there is no abuse of discretion. *Montgomery*, 810 S.W.2d at 391.

The State offered into evidence a page from the medical intake form completed by a trained paramedic working for the Brazos County Sheriff's Office. Tennell objected to the exhibit as hearsay. The State argued that the document fell under the hearsay exception for statements made for the purpose of medical diagnosis. *See* TEX. R. EVID. 803(4). Tennell argued that the document was prepared by law enforcement and therefore did not fall under the hearsay exception. The State responded that the questionnaire was a "recording" of Tennell's statement, "just like a transcript would be." The trial court overruled the hearsay objection.

On appeal, the State argues that the questionnaire was admissible as a record of regularly conducted business activity. *See* TEX. R. EVID. 803(6). It further

10

contends, as it did at trial, that the exhibit was properly admitted as a statement made for medical treatment or diagnosis under Rule 803(4).

Tennell argues that the paramedic did not testify as a records custodian for the Brazos County Jail and the State failed to lay the proper predicate for the business-records hearsay exception. However, the rule provides that the predicate may be established by the custodian of records for the business or "another qualified witness." TEX. R. EVID. 803(6)(D); *see also Melendez v. State*, 194 S.W.3d 641, 644 (Tex. App.—Houston [14th Dist.] 2006, pet. ref'd). Tennell fails to provide any argument that the paramedic, despite not being described as a records custodian, was not a qualified witness to sponsor the evidence. The paramedic specifically testified that she completed the medical interview form based on knowledge that she acquired at the time it was imparted to her by Tennell. *See* TEX. R. EVID. 803(6)(A). She further testified that it was a record that she created "regularly" as part of "the regular course of business at the jail." *See* TEX. R. EVID. 803(6)(B), (C). We conclude that the trial court would not have abused its discretion to admit the document under the business-record exception to the hearsay rule. *See* TEX. R. EVID. 803(6); *see, e.g., Moyer v. State*, 948 S.W.2d 525, 528 (Tex. App.—Fort Worth 1997, pet. ref'd).

When a document is admissible as a business record under Rule 803(6), statements contained within it nevertheless may be inadmissible hearsay. *Garcia v. State*, 126 S.W.3d 921, 926 (Tex. Crim. App. 2004). If the record contains

11

information from a person outside of the business who had no duty to report or to report accurately, such information is not admissible unless there is an independent qualification for its admission under a hearsay exception. *Id.* at 926–27. That a statement was made for medical diagnosis or treatment can qualify as an independent basis for a statement's admissibility under an exception to the hearsay rules. *Id.*; *see* TEX. R. EVID. 803(4). A statement made for and reasonably pertinent to a medical diagnosis or treatment, and that "describes medical history; past or present symptoms or sensations; their inception; or their general cause" may be admissible as an exception to the rule against hearsay. TEX. R. EVID. 803(4).

Tennell argues that he was not at the jail seeking treatment for a medical condition, and his statements therefore do not fall under the hearsay exception for medical diagnosis or treatment. "Rule 803(4) is premised on the declarant's desire to receive an appropriate medical diagnosis or treatment, and the assumption that the declarant appreciates that the effectiveness of the diagnosis or treatment may depend on the accuracy of the information provided." *Munoz v. State*, 288 S.W.3d 55, 58 (Tex. App.—Houston [1st Dist.] 2009, no pet.). A two-part test is used to determine whether the declarant believed that his statements would be utilized for the purpose of his medical diagnosis or treatment and that the truthfulness of his statements can therefore be relied upon. *Id.*; *see Taylor v. State*, 268 S.W.3d 571, 588–89, 591 (Tex. Crim. App. 2008). "First, the statement must be made for the purpose of diagnosis or treatment, and the declarant must know that it is made for

12

the purpose of diagnosis and treatment." *Munoz*, 288 S.W.3d at 58 (citing *Taylor*, 268 S.W.3d at 588–89). Second, the statement must be relevant to a medical diagnosis or treatment. *Id.* (citing *Taylor*, 268 S.W.3d at 591). If the record circumstantially supports an inference that the declarant understood the purpose of his statement to be for medical treatment or diagnosis, and the need to be truthful in his statement, it may be excepted from the rule against hearsay under Rule 803(4). *See Taylor*, 268 S.W.3d at 585; *see also Munoz*, 288 S.W.3d at 58.

Tennell relies upon *Garcia v. State*, 126 S.W.3d 921 (Tex. Crim. App. 2004), to support his contention that his statements were not made for the purpose of medical treatment or diagnosis. In *Garcia*, the Court of Criminal Appeals held that Rule 803(4) was inapplicable to statements made by the complainant to an employee of a women's shelter because there was no evidence that the complainant had visited the shelter for the purpose of receiving a medical diagnosis or treatment, or that she actually received medical diagnosis or treatment from the shelter's employees. *Id.* at 927.

The facts of this case are distinguishable from the facts in *Garcia*. The trained paramedic testified that she worked in the medical division of the jail. She was responsible for assessing the mental and physical status of incoming inmates to determine whether they had any particular medical needs, and to provide informed treatment for inmates during their time at the jail. Unlike the circumstances of the complainant's reports to a shelter employee as described in

*Garcia*, the paramedic in this case testified that questions about drug use were used to determine whether "the inmate may detox." As part of the intake process, Tennell's blood pressure and pulse were taken, and he was asked about his allergies, medical history, current health problems, current physician, and prescribed medications. Although Tennell did not go to the jail for the purpose of medical treatment or diagnosis, the trial court reasonably could have inferred that the specific purpose of the paramedic's questions was to determine whether Tennell was in need of medical treatment for a physical or mental condition, and that the circumstantial evidence demonstrated that he answered the questions in cooperation with and in furtherance of that purpose. Accordingly, the trial court did not abuse its discretion by admitting the form or the statements contained in it. *See Munoz*, 288 S.W.3d at 58. We therefore overrule Tennell's complaint about the admission of hearsay evidence.

## II. Lesser-included offense instructions

Tennell was charged with capital murder for intentionally or knowingly causing the death of an individual under ten years of age. *See* TEX. PENAL CODE §§ 19.02(b)(1), 19.03(a)(8). The trial court's proposed jury charge included an instruction on capital murder and an instruction on the lesser-included offense of felony murder based on the underlying offense of reckless injury to a child. *See id.* §§ 19.02(b)(3), 22.04(a). At the charge conference, Tennell requested additional instructions on the lesser offenses of manslaughter, criminally negligent homicide,

and felony murder based on the underlying offense of possession of a controlled substance. The court denied the requests. Despite the option of convicting on the lesser-included charge of felony murder, the jury found Tennell guilty of capital murder. On appeal, he challenges only the denial of his request for a manslaughter instruction.

Because the manslaughter instruction was requested at trial, if the denial of the instruction was an error we will reverse if "some harm" resulted. *Nangurai v. State*, 507 S.W.3d 229, 234 (Tex. App.—Houston [1st Dist.] 2014, pet. ref'd). A two-part test is applied to determine whether a defendant is entitled to an instruction on a lesser-included offense. *See Cavazos v. State*, 382 S.W.3d 377, 382–83 (Tex. Crim. App. 2012). The first step is a question of law, which "compares the elements alleged in the indictment with the elements of the lesser offense" to determine "if the proof necessary to establish the charged offense also includes the lesser offense." *Id.* at 382. The second step of the test requires consideration of whether there is some evidence that would allow a rational jury to acquit the defendant of the greater offense while convicting him of the lesser-included offense. *Id.* at 383; *Sweed v. State*, 351 S.W.3d 63, 68 (Tex. Crim. App. 2011).

Tennell's brief acknowledges that a "jury's failure to find an intervening lesser-included offense (one that is between the requested lesser offense and the offense charged) may, in appropriate circumstances, render a failure to submit the

15

requested lesser offense harmless." *Masterson v. State*, 155 S.W.3d 167, 171 (Tex. Crim. App. 2005). He further concedes that the mental state required for manslaughter—recklessness—was the same mental state required for the felony-murder charge rejected by the jury in favor of its guilty verdict on the capital-murder charge. Still, Tennell suggests that "differences remain" between the proposed lesser-included offense of felony murder based on reckless injury to a child and manslaughter because the jury would have had to find that he committed an act clearly dangerous to human life to convict him of felony murder, *see* TEX. PENAL CODE § 19.02(b)(3), but that is not an element of manslaughter, *see id.* § 19.04.

Tennell's argument does not explain why he was entitled to a manslaughter instruction in addition to the lesser-included felony-murder instruction that was given. He attempts to analogize his case to *Roy v. State*, 509 S.W.3d 315 (Tex. Crim. App. 2017), a murder case in which the Court of Criminal Appeals held that a lesser-included manslaughter instruction was required. *Roy* is distinguishable because some evidence in that case suggested that the appellant deliberately caused a fatal car crash, and he was charged with a different theory of murder, TEX. PENAL CODE § 19.02(b)(2), which required proof that he intended to cause serious bodily injury. *Roy*, 509 S.W.3d at 317. The Court held that other evidence would have allowed a jury to find that the appellant did not intend to cause harm yet did disregard the risk of causing death by driving while intoxicated, thus requiring the

16

manslaughter instruction. *Id.* at 319. Unlike this case, *Roy* did not feature the circumstance of a capital-murder charge premised on intentional conduct paired with an instruction on a lesser-included felony-murder offense that was premised on reckless conduct.

Tennell does not suggest what evidence would have allowed a rational jury to convict him of only manslaughter while acquitting him of the felony-murder charge premised on reckless injury to a child. *Cf. Sweed*, 351 S.W.3d at 68. "[I]t is not enough that the jury may disbelieve crucial evidence pertaining to the greater offense, but rather there must be some evidence directly germane to the lesser-included offense for the finder of fact to consider before an instruction on a lesser-included offense is warranted." *Bullock v. State*, 509 S.W.3d 921, 925 (Tex. Crim. App. 2016). While he suggests that a jury could have chosen to convict him of manslaughter because that charge would not have required the jury to find that he committed an act clearly dangerous to human life, he fails to suggest what evidence would have supported a rational jury in drawing that distinction. *See Hudson v. State*, 449 S.W.3d 495, 498–99 (Tex. Crim. App. 2014) (holding defendant was not entitled to a lesser-included instruction on manslaughter when the proof upon which she relied was also sufficient to prove another, greater lesser-included offense of capital murder); *Flores v. State*, 245 S.W.3d 432, 439 (Tex. Crim. App. 2008) ("A defendant does not satisfy the second prong" of the standard for determining if a lesser-included instruction is required "if there is evidence that

he committed an offense that is a lesser-included of the charged offense but greater than the requested lesser-included offense."). Nor does he explain how he could have been harmed by the failure to give the manslaughter instruction when the jury convicted him of capital murder despite having the option of convicting him of felony murder based on reckless injury to a child. *See Masterson*, 155 S.W.3d at 172. Accordingly, we overrule Tennell's challenge to the trial court's denial of his request for lesser-included-offense jury instructions.

## III.    Denial of motion for new trial

Tennell's remaining issues relate to the denial of his motion for new trial. On the day after Tennell was sentenced, his trial counsel was informed by the prosecutors that Harris met with them after the sentencing. She stated that the jeans that Tennell was wearing on the day of Hailey's death were the jeans that had been admitted into evidence at trial and were stained with PCP. Tennell filed a motion for new trial asserting that this allegedly exculpatory information was withheld from his counsel before trial. The motion also argued that this information justified a new trial because it constituted newly discovered evidence, and that deadlines applicable to a motion for new trial were unconstitutional as applied to him.

Before trial, Harris had stated that Tennell was wearing jeans the day Hailey died. The prosecution provided that information to defense counsel in discovery responses almost two years before trial. The prosecution also produced documents indicating that a pair of jeans had been collected from the apartment and submitted

18

for toxicology testing. Shortly before trial, those jeans were tested for the presence of PCP, and the positive results were provided to defense counsel.

In the hearing on his motion for new trial, Tennell offered into evidence notes from a meeting Harris had with two prosecutors and an investigator approximately two weeks before trial. Notes from each of the three members of the prosecution team indicated that Harris had stated Tennell wore "blue jeans" or "dark blue" jeans. These notes were not provided to the defense until after trial. The crux of the *Brady* claim was that the prosecution should have informed defense counsel that Harris described the jeans as "blue jeans" or "dark blue" jeans, rather than just "jeans," because the prosecution knew or should have suspected that she would identify the PCP-stained jeans as the jeans that Tennell was wearing on the day of Hailey's death.

At the hearing, the State offered into evidence a written report, titled "Supplement: 0033," that had been prepared by Detective Davis and that included a brief summary of an interview with Harris on the day after Hailey's death. According to the summary, Harris told the detectives that when she left the apartment to take her older daughter Riley to the eye appointment, Tennell was sitting on the living-room sofa, wearing "a T-shirt, jeans and slides." Defense counsel agreed that Supplement 33 was provided in the State's first batch of discovery responses, almost two years before trial. Defense counsel also agreed

that Supplement 33 would have been one of the first things reviewed in preparation for the case.

The State also offered into evidence two recordings of Detective Davis interviewing Tennell. The first recording was an interview conducted on the day of Hailey's death, in which Tennell claimed that a bottle of PCP had burst in his pocket the night before, spilling PCP onto his skin. During the second interview, conducted approximately one week later, Detective Davis confronted Tennell with inconsistencies between his and Harris's accounts of certain details about the day of Hailey's death. Detective Davis explained that Harris had said she remembered that Tennell was sitting on the couch when she left, and he was wearing a white t-shirt, jeans, and "red slides." Defense counsel conceded that recordings of both interviews of Tennell were included in the State's first batch of discovery responses. Counsel further stated that both audio files had been reviewed "multiple times." Nevertheless, two different lawyers working on Tennell's defense each testified that they had missed both references to "jeans" in the State's discovery responses.

The lead prosecutor testified that he had not suspected that the jeans in evidence were the same jeans that Harris had mentioned in her earliest statement to police. He added that he had never asked Harris if the jeans in evidence were the same jeans that Tennell was wearing on the day Hailey died and that she had never told the prosecution that the blue jeans in evidence were the blue jeans that Tennell

was wearing that day. The prosecution had not shown the jeans or photographs of the jeans to Harris before trial, and only after sentencing did they learn from her that she had seen Tennell in those particular jeans on the day Hailey died. The lead prosecutor explained:

> Actually that was the weird thing about it. If you're talking about what we were thinking at the time, we didn't know exactly what was going on. I assumed that the jeans had been tested -- I assumed that at the time. When we found out they weren't tested, we were thinking, "well, wait a minute. Are they trying to say that Crystal was going to be the person that killed Hailey?" We didn't know what the defense was going to be at that time.
>
> We knew that the defendant had admitted that he had -- what he had said about the PCP breaking in his pants was not true because two weeks later he talked to the police and said that none of that stuff was true, that he had smoked that day. We also knew that the jail incident -- the jail records show that when they asked him what drugs he had in his system, he said that he had smoked PCP. He didn't say anything about any spillage.
>
> So we did not know what was going to happen with these jeans. Wasn't as important to us. We knew that the defendant had been smoking and he had conceded that he had been smoking that day, and -- it wasn't a big deal. She had said there was blue jeans to the police, she told us it was blue jeans. The issue for us was that he was smoking PCP.
>
> . . . .
>
> I guess what I'm trying to get you into my mind of -- this was -- when he -- there wasn't a question of involuntary intoxication when he admitted to smoking that day. So the jeans -- the argument about the jeans or whether or not there's something that spilled on the jeans from him voluntarily smoking was not in issue.

> So he had -- the only issue with the jeans and with it being absorbed through the jeans is when it -- possibly the night before where he said that there was something that burst in his pants.
>
> . . . .
>
> The evidence that we had was that the defendant stated that he had spilled PCP on his jeans the night before, he threw those jeans down behind the couch. He doesn't say anything about putting those jeans back on. So we're not thinking that these are the same jeans at that time.

The lead prosecutor also testified that he never made the connection—and that it never crossed his mind—that the jeans in evidence were the jeans that Tennell was wearing on the day of Hailey's death until Harris told him so after the sentencing.

One of the defense lawyers testified that she had asked Tennell if he had been wearing the jeans, but he told her that he "could not remember anything about the immediate surroundings of the baby's death or about what he was doing, what he was wearing." The defense lawyer was not asked if she had questioned Tennell about what he was wearing earlier in the day.

A psychological evaluation of Tennell performed a month before trial was also admitted into evidence at the new-trial hearing. The State had sought the examination in anticipation of a possible insanity defense, and the evaluation report was provided to defense counsel soon after its release. The report recounted Tennell's story that the PCP bottle had leaked in his pants pocket on the way to Harris's house and that when he returned to the house, he took off the pants and

22

left them at the front door. Tennell also reported to the psychologist some of the details he had told the police, such as going to the junkyard with Harris's brother-in-law, but he also reported that with respect to Hailey, "Everything is a blur." The lead prosecutor testified, based on Tennell's version of events as reported in the psychologist's report, that he did not think that Tennell was unable to tell his lawyers what he was wearing.

The defense lawyer also testified that she never attempted to speak to Harris before trial, nor did she send an investigator to speak with her. The lawyer testified that she was worried about damaging Tennell's case if someone from the defense team contacted Harris before trial and said something to upset her.

Noting that the defense had asked Harris at trial if she had smelled PCP on Tennell's "pants" the night before Hailey died, the State asked defense counsel why she had not also asked Harris about her statement to Detective Davis that Tennell had been wearing jeans. Counsel stated that at that time she had not remembered the word "jeans" from the report. In an affidavit attached to Tennell's motion for new trial, defense counsel stated that she chose not to ask Harris whether she had seen Tennell wearing the PCP-stained jeans because she did not know how Harris would answer the question. Counsel believed that if Harris denied that she had seen Tennell in the PCP-stained jeans, it would destroy the defensive theory. Both defense lawyers conceded that Detective Davis would have

23

been available as a defense witness, but they made a strategic decision not to call him to the stand.

In support of the argument that the State knew the PCP-stained jeans were the same ones Harris had seen him wearing on the day of the murder, Tennell offered into evidence a recording and transcript of a call between Harris and a defense investigator. During the call, which took place several weeks after trial, Harris told the investigator that she had explained to the prosecution before trial that Tennell's story about PCP spilling in his jeans pocket the night before Hailey's death could not be true because he was wearing shorts that night, and he did not put on "those jeans" until the next morning.

Harris testified at the hearing on the motion for new trial. She first testified that Tennell was wearing what she later learned were the PCP-stained jeans when she left him with Hailey on the day of her death, but at no point in the two years before trial did she ever know that there was a claim that PCP had been spilled on those jeans. Harris clarified that she had told prosecutors and detectives that Tennell was wearing blue jeans when she last left him with Hailey, but the prosecution had never shown her the PCP-stained jeans or photographs of those jeans that had been collected from the apartment. The first time she saw those jeans again after Hailey's death was when defense counsel held them up during closing argument. Harris then realized that they were the jeans she had seen Tennell wearing the day of Hailey's death, and she informed the prosecutors the following

24

day. She thus explained in her testimony that when she had told the prosecutors and police all along that Tennell was wearing jeans, blue jeans, or dark blue jeans when she left Hailey with him on the day of her death, she did not know that the jeans that she had been mentioning were the PCP-stained jeans that she recognized in closing argument.

The trial court denied the motion for new trial. We review a trial court's ruling on a motion for new trial under an abuse-of-discretion standard. *Webb v. State*, 232 S.W.3d 109, 112 (Tex. Crim. App. 2007). We view the evidence in the light most favorable to the trial court's ruling, and we must uphold the trial court's ruling if it was within the zone of reasonable disagreement. *Id.* "[A] trial court abuses its discretion in denying a motion for new trial only when no reasonable view of the record could support the trial court's ruling." *Id.* The credibility of the witnesses in a new-trial hearing is primarily a determination for the trial court. *Pina v. State*, 127 S.W.3d 68, 72 (Tex. App.—Houston [1st Dist.] 2003, no pet.). "In considering a motion for new trial, the trial judge possesses broad discretion in assessing the credibility of witnesses and in weighing the evidence to determine whether a different result would occur upon retrial." *Messer v. State*, 757 S.W.2d 820, 827 (Tex. App.—Houston [1st Dist.] 1988, pet. ref'd) (op. on reh'g).

## A.  *Brady* claim

Tennell contends that the trial court erred by denying his motion for new trial because the prosecution withheld exculpatory evidence—that Harris had

changed her description of the jeans from "jeans" to "blue jeans" or "dark blue" jeans. He asserts that the prosecution withheld the information that when Harris last left her apartment before Hailey's death, she saw Tennell wearing jeans, and that the jeans were the same ones collected from the apartment and that later tested positive for PCP. He contends that this information would have supported his theory of transdermal absorption of PCP, and therefore would have made the lesser-included offense of felony murder based on reckless injury to a child a more viable option for the jury.

"A prosecutor has an affirmative duty to turn over material, favorable evidence to the defense." *Little v. State*, 991 S.W.2d 864, 866 (Tex. Crim. App. 1999). The suppression of evidence favorable to a defendant violates his due-process rights if the evidence is material either to guilt or punishment, without regard to the good or bad faith of the prosecution. *Brady v. Maryland*, 373 U.S. 83, 87, 83 S. Ct. 1194, 1196–97 (1963). To establish a *Brady* violation, a defendant must show: (1) the State failed to disclose evidence; (2) the withheld evidence is favorable to the defendant; and (3) the evidence is material, that is, there is a reasonable probability that had the evidence been disclosed, the outcome in the trial court would have been different. *Pena v. State*, 353 S.W.3d 797, 809 (Tex. Crim. App. 2011); *Hampton v. State*, 86 S.W.3d 603, 612 (Tex. Crim. App. 2002). "Favorable evidence is any evidence that, if disclosed and used effectively, may make a difference between conviction and acquittal and includes both exculpatory

and impeachment evidence." *Harm v. State*, 183 S.W.3d 403, 408 (Tex. Crim. App. 2006). Exculpatory evidence is that which may justify, excuse, or clear the defendant from fault, and impeachment evidence is that which disputes, disparages, denies, or contradicts other evidence. *Id.*

The prosecution's obligation to reveal *Brady* material attaches when the information comes into the prosecution's possession. *Id.* at 407. *Brady* does not, however, require the prosecution to disclose exculpatory or potentially exculpatory evidence that it does not have in its possession and that is not known to exist. *Id.* Nor is the prosecution required "to seek out exculpatory evidence independently on appellant's behalf, or furnish appellant with exculpatory or mitigating evidence that is fully accessible to appellant from other sources." *Id.*

It is undisputed that the State provided discovery responses to Tennell's counsel almost two years before trial and that this discovery included Detective Davis's report indicating that Harris told him that Tennell was wearing "jeans" when she last left him alone with Hailey. It also included a recording of Tennell's first interview with police in which he stated that he spilled PCP on his pants the night before Hailey's death. And it included a recording of a second interview of Tennell in which Detective Davis told him that Harris claimed he was wearing jeans when she left him with Hailey. It is also undisputed the defense was aware before trial that jeans, ultimately admitted into evidence at trial, had been collected from the apartment and that a swatch from the jeans tested positive for PCP.

Tennell disparages the discovery provided to his defense team as a "discovery dump." But he presents no argument or evidence that the State obscured the information that Harris stated he was wearing jeans before she left the apartment. Also, the State argues that Tennell's lead trial lawyer admitted at the new-trial hearing that the first discovery documents that she received totaled only fifty-four pages and included the police reports mentioning that Tennell had said he was wearing jeans and that the bottle with PCP had broken in his pocket.

The record shows that the State disclosed to Tennell's lawyers the very information that he now complains was unlawfully withheld. As for Tennell's complaint that the State failed to disclose that Harris saw him wearing the jeans that tested positive for PCP, he has failed to show that the State had that particular information before trial. The evidence before the trial court was that Harris did not know before trial that the jeans that she had described early in the investigation to police as "jeans" and that she had described to the prosecution team as "blue jeans" or "dark blue jeans" were jeans that Tennell claimed had been soaked with PCP. And the lead prosecutor testified that he had not suspected that the jeans in evidence were the same jeans that Harris had mentioned in her earliest statement to police.

Without a failure to disclose evidence, there is no *Brady* violation. *Harm*, 183 S.W.3d at 406. By providing counsel discovery materials that contained references to Harris's earliest statement that Tennell was wearing jeans and the

results of the PCP testing on the jeans, the State fulfilled any obligation it had with respect to that evidence. *Cf. Gill v. State*, No. 01-09-01012-CR, 2010 WL 4910210, at *4 (Tex. App.—Houston [1st Dist.] Dec. 2, 2010, no pet.) (mem. op., not designated for publication) (citing *Harm*, 183 S.W.3d at 407) (If the State opens its files for examination by defense counsel, it generally fulfills its obligation to disclose exculpatory evidence, unless the evidence is not contained in the file.).

Because Tennell has failed to establish that the State withheld information in its possession or that it knew to exist, he has failed to satisfy the first prong, requiring him to show that a *Brady* violation occurred. Further, the State did not have a duty to investigate or develop Tennell's defense with respect to determining whether the jeans that Harris originally described to the police and to the prosecution team were the PCP-stained jeans and whether she would testify to that fact at trial. Moreover, as discussed above, defense counsel strategically decided not to interview Harris before trial about the jeans in evidence and strategically decided not to ask her at trial if the jeans in evidence were the jeans that she saw Tennell wearing on the day of Hailey's death. And to the extent that Tennell has questioned Harris's and the lead prosecutor's credibility on their new-trial testimony about the jeans, it was the trial court's role to assess their credibility in ruling on the motion for new trial. We therefore conclude that the trial court did not abuse its discretion by failing to grant a new trial based on the alleged *Brady* violation.

**B.     Newly discovered evidence**

Tennell separately contends that the trial court erred by denying his motion for new trial based on his discovery of new material evidence. As with the *Brady* claim, this issue is premised on the theory that he did not learn until after trial that Harris saw him on the day of Hailey's death wearing the PCP-stained jeans.

"A new trial shall be granted an accused where material evidence favorable to the accused has been discovered since trial." TEX. CODE CRIM. PROC. art. 40.001. To obtain relief under this rule, the defendant must satisfy a four-prong test: (1) the newly discovered evidence was unknown or unavailable to the defendant at the time of trial; (2) the defendant's failure to discover or obtain the new evidence was not due to his lack of due diligence; (3) the new evidence is admissible and not merely cumulative, corroborative, collateral, or impeaching; and (4) the new evidence is probably true and will probably bring about a different result in a new trial. *State v. Arizmendi*, 519 S.W.3d 143, 149 (Tex. Crim. App. 2017).

Tennell's counsel claimed they were unaware at the time of trial that Harris saw Tennell wearing the PCP-stained jeans the day of Hailey's death. But even to the extent they were subjectively unaware of this information, to be entitled to a new trial based on newly discovered evidence, Tennell had to show that the failure to discover this evidence was not due to his own lack of diligence.

The prosecution provided Tennell's counsel with discovery that included two references to the fact that Harris saw Tennell wearing "jeans" the morning of the murder. These references were contained in the report of the lead detective and in an interview of Tennell himself. The information was provided to defense counsel almost two years before trial.

Even to the extent Tennell's legal team failed to find or perceive the significance of the information disclosed by the prosecution in discovery about Harris's statement, Tennell himself was aware of the facts that he was with Harris on the night before Hailey's death and on the following morning. He had personal knowledge of the facts at issue, including the circumstance that Harris was a witness who possibly could have confirmed the information. Nevertheless, his legal team did not attempt to speak with Harris before trial. Tennell's counsel testified at the hearing on the motion for new trial that this was a strategic decision.

The trial court reasonably could have determined that through reasonable diligence, Tennell's counsel could have obtained the information that Harris saw him wearing the PCP-stained jeans on the day of Hailey's death. Accordingly, the trial court did not abuse its discretion by denying a new trial based on the claim of newly discovered evidence.

## IV. Constitutionality of new-trial motion deadlines

Tennell argues that the deadline for filing a motion for new trial is unconstitutional as applied to him because it thwarted his ability to defend his constitutional rights.

A motion for new trial is a prerequisite to presenting a point of error or issue on appeal when it is necessary to adduce facts not in the record. TEX. R. APP. P. 21.2. Such a motion must be filed within 30 days after the date the trial court imposes or suspends sentence in open court. TEX. R. APP. P. 21.4(a). Tennell argues that, under his circumstances, the deadline for filing a motion for new trial did not allow for "adequate investigation and accompanying support" for "extra-record matters." He broadly argues that because he is indigent and has been jailed since his sentencing, and because his trial and appellate counsel were court-appointed, he is unable to make a substantial claim that he received ineffective assistance of counsel.

While Tennell's brief outlines potential arguments that he received ineffective assistance of counsel, he provides no argument about how the existing procedures were inadequate to allow his counsel to raise those issues on the schedule established by the rules of procedure, so as to be unconstitutional as applied to him in this case. *See London v. State*, 526 S.W.3d 596, 599–600 (Tex. App.—Houston [1st Dist.] 2017, pet. ref'd). The brief recites the Fifth, Sixth, and Fourteenth Amendments of the U.S. Constitution and Sections 10 and 19 of the

Texas Bill of Rights as constitutional provisions that are violated by a "systemic failure" of rules that are not specifically identified, but the brief makes no legal argument about how particular procedural rules violate particular constitutional protections with a discussion of applicable case law under those several constitutional provisions, and the brief makes only conclusory allegations of harm. *See* TEX. R. APP. P. 38.1(i) (appellant's brief must contain "a clear and concise argument for the contentions made, with appropriate citations to authorities"). Accordingly, we conclude that Tennell has waived his constitutional challenge to the procedures governing motions for new trial by failing to support the challenge with appropriate legal arguments.

## V.     Constitutionality of Penal Code Chapter 19

Finally, Tennell argues that the trial court erred by denying his motion to declare Chapter 19 of the Penal Code unconstitutional and failing to set aside the indictment on that basis. Chapter 19 codifies the substantive law applicable to criminal homicide in Texas.

On appeal Tennell argues that Chapter 19 violates his right to equal protection under the federal and state constitutions. In the trial court Tennell made an oral motion to the trial court, asking it to declare Penal Code Section 12.31 and Code of Criminal Procedure Article 37.071, Section 1, unconstitutional, based on the mandatory sentence of life without parole applicable to capital-murder

convictions. However, the record does not reflect that Tennell ever argued that Chapter 19 is unconstitutional.

Because Tennell's argument on appeal differs from his argument in the trial court, he has not preserved this issue for review. *See* TEX. R. APP. P. 33.1(a); *Wilson v. State*, 71 S.W.3d 346, 349 (Tex. Crim. App. 2002).

## Conclusion

We affirm the judgment of the trial court.


Michael Massengale
Justice

Panel consists of Justices Keyes, Bland, and Massengale.

Do not publish. TEX. R. APP. P. 47.2(b).