

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

_____

No. 06-21-00132-CR
_____

HUBERT KINDLE, Appellant

V.

THE STATE OF TEXAS, Appellee

On Appeal from the 188th District Court
Gregg County, Texas
Trial Court No. 50598-A

Before Morriss, C.J., Stevens and van Cleef, JJ.
Memorandum Opinion by Justice van Cleef

## MEMORANDUM OPINION

A Gregg County jury convicted Hubert Kindle of aggravated assault with a deadly weapon[1] and unlawful possession of a firearm by a felon.[2]  Due to enhancements for prior felony convictions[3], the trial court sentenced Kindle in accordance with the jury's recommendation of fifty-five years' imprisonment for the aggravated assault and twenty years' imprisonment for the unlawful possession.

Here, Kindle appeals from his conviction for aggravated assault with a deadly weapon.[4] On appeal, Kindle argues that the trial court erred by admitting a video recording from a security camera.

We affirm the trial court's judgment because any error in admitting the video was harmless.

In his sole point of error, Kindle contends that the trial court erred in admitting State's Exhibit 38, a video recording from a security camera at the service station where Apollo Smith was shot on the night of November 10, 2019.

"We review a trial court's decision to admit or exclude evidence for an abuse of discretion." *Flowers v. State*, 438 S.W.3d 96, 103 (Tex. App.—Texarkana 2014, pet. ref'd) (citing *Martinez v. State*, 327 S.W.3d 727, 736 (Tex. Crim. App. 2010)).  "Abuse of discretion

---

[1]TEX. PENAL CODE ANN. §§ 22.01(a)(1), 22.02(a)(2) (Supp.).

[2]TEX. PENAL CODE ANN. § 46.04(a) (Supp.).

[3]Kindle did not dispute that he had prior felony convictions.

[4]Kindle appeals from his conviction for unlawful possession of a firearm by a felon in cause number 06-21-00133-CR.

occurs only if the decision is 'so clearly wrong as to lie outside the zone within which reasonable people might disagree.'" *Id.* (quoting *Taylor v. State*, 268 S.W.3d 571, 579 (Tex. Crim. App. 2008) (citing *Montgomery v. State*, 810 S.W.2d 372, 391 (Tex. Crim. App. 1990) (op. on reh'g))). "We may not substitute our own decision for that of the trial court." *Id.* (citing *Moses v. State*, 105 S.W.3d 622, 627 (Tex. Crim. App. 2003)). "We will uphold an evidentiary ruling if it was correct on any theory of law applicable to the case." *Id.* (citing *De La Paz v. State*, 279 S.W.3d 336, 344 (Tex. Crim. App. 2009)).

Kindle argues that State's Exhibit 38, the video recording, was inadmissible because the State failed to lay a proper predicate for its admission. The two clerks working at the service station that night, Jacob Davis and Dylan Glasco, confirmed that the service station had security cameras that offered an accurate depiction of the events that happened in the station, that the cameras recorded the "front of the store, outside, [and] on the sides," and that the cameras were operating on the night of November 10, 2019. However, neither Davis nor Glasco testified that they had seen the recording from the night of the shooting. Unedited copies of the security camera recordings from the store were later provided to law enforcement. Investigator Scott Morrison testified that he was the officer who received the security camera recordings, that he had reviewed the recordings from the night of the shooting, that they had not been altered or tampered with, and that they accurately depicted the gas station that evening. However, on voir dire, Morrison admitted that he did not know how the video system's software operated or how the data was stored. After hearing the parties' arguments, the trial court admitted the recording over Kindle's objection and played the recording for the jury.

3

Even assuming, without finding, that the trial court erred in admitting the security camera video, the error was harmless. To determine whether the erroneous admission of evidence amounts to reversible error, we look to Rule 44.2(b) of the Texas Rules of Appellate Procedure, governing non-constitutional error in criminal cases. *See* TEX. R. APP. P. 44.2(b). Neither appellant nor the State bears "the burden to demonstrate whether appellant was harmed by the trial court's error." *See Johnson v. State*, 43 S.W.3d 1, 5 (Tex. Crim. App. 2001). Rather, it is this Court's responsibility to assess, from the context of the error, whether the judgment requires reversal because the error affected appellant's substantial rights. *See id.* "A substantial right is affected when the error had a substantial and injurious effect or influence on the jury's verdict." *King v. State*, 953 S.W.2d 266, 271 (Tex. Crim. App. 1997) (citing *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)). In making this determination, we review the record as a whole. *Kotteakos v. United States*, 328 U.S. 750, 764–65 (1946). While we may consider whether there is overwhelming evidence of Smith's guilt, we are to consider erroneous admission of the security camera video in the context of the entire record. *See Motilla v. State*, 78 S.W.3d 352, 358 (Tex. Crim. App. 2002).

There is ample evidence supporting Kindle's guilt. Amanda Ferrell testified that, on the night of November 10, 2019, she and Smith, her boyfriend at the time,[5] were riding his motorcycle "to town . . . to pick up his check." The couple stopped at the Barracuda Gas & Grill to work on the motorcycle's engine trouble, to get gas, and to get a pack of cigarettes for a friend. Ferrell saw Kindle, a former romantic interest of hers that she knew well, arrive in a car

---

[5]At the time of trial, Ferrell was no longer in a relationship with Smith.

4

and park at the side of the station. Smith described Kindle's car as a "shiny little black-ish car with shiny rims." As she and Smith were trying to find someone to help jumpstart the motorcycle, Kindle and a friend of his walked over. Ferrell asked about getting some help starting their motorcycle, but Smith did not want Kindle's help because he did not know Kindle and he was not "hip on strangers." Ferrell said Smith was very "laidback," but that Kindle was "a big person," and that night he "had been obviously drinking."

Smith testified that Kindle got angry when Smith did not let him get on the motorcycle and try to push-start it. Smith and Ferrell both testified that Kindle said some disparaging things to Smith and twice struck Smith in the head. Ferrell testified that Kindle said something about "settling it," and Smith got off of the motorcycle and "went for the . . . side pouch of the bike." She believed he was "going for jumper cables" that were in there, and she told Smith, "[W]hatever you're doing, we're not going to handle this this way. We can get help inside." She testified that Smith did not actually get anything out of the motorcycle's pouch. She told Kindle, "If this is the kind of help you give, then we don't need it."

Ferrell testified that the men separated, and both Smith and Ferrell saw Kindle walk back to his car and do something in his trunk while Smith walked toward the service station. When she saw Kindle walk onto the station's sidewalk with a gun, Ferrell yelled at Smith to run. Smith saw the gun in Kindle's hand and heard Ferrell yell for him to run, and he started to run through the station's front doors. Ferrell testified that she saw Kindle fire three or four shots at Smith as he was running into the service station. Smith described what it felt like when he was shot, and he remembered falling into the doorway. Both Smith and Ferrell testified that they were certain

5

that Kindle was the man who shot Smith. Ferrell testified that, after shooting Smith, Kindle walked to the station's door and opened it—"it looked like to make sure that he shot [Smith]"—and then he "walked away." Ferrell entered the service station, called for emergency services, and then checked on Smith.

Andrew Bessey testified that he was in the Barracuda that night at about 9:00 p.m. when he heard four gunshots from "right outside the [service station] window." He ducked behind the counter. After he came out from the behind the counter, he found a man later identified as Smith lying on the floor just inside the station's front doors; Smith had been shot. Bessey looked out the window and saw an African American man who had shot Smith walk away at a "fast pace." Bessey admitted that he did not get a particularly good view of the man.

Upon finding Smith, Bessey called his father, Kevin Bessey, an instructor for the Kilgore College Fire Academy, who was also a former firefighter and emergency medical technician. Because Kevin lived close by, he arrived within a few minutes of the shooting and was able to provide on-scene medical care to Smith until an ambulance arrived on the scene. While Kevin treated Smith, Smith told him that a Kindle had shot him. Kevin wrote Kindle's name on his hand and photos of the writing on Kevin's hand were admitted into evidence and published to the jury.

Davis and Glasco were working at the Barracuda on the night of November 10, 2019. Glasco remembered hearing three gunshots, but Davis remembered four or five. After hearing the shots, Davis looked around the store, they both ducked behind the counter for protection, and Glasco activated the store's emergency alarm system. Davis saw the man who shot Smith, and

6

although he did not get a good look at his face, he described the man as an older, "African" man with a "bigger" build.

Investigator Scott Morrison was one of several officers called to the Barracuda on November 10, 2019. He described seeing a motorcycle parked by the gas pumps and four shell casings from a ".45 auto" firearm on the sidewalk outside the station.

The video recording appears to show a man and a woman pulling their motorcycle up to a gas pump at the service station, and it also shows a small black car with prominent rims being parked at the station. As corroborated by the testimony of Ferrell and Smith, the video shows an altercation between two men at the gas pump where the motorcycle was parked, the men separating, and one man appearing to shoot the other as he was heading into the service station. While the video shows that the shooter fled the scene in the small black car, it does not clearly show the shooter's face.

Here, two eyewitnesses testified that they saw Kindle shoot Smith with a firearm. While Smith was lying on the floor, bleeding from his wounds, he told Kevin that Kindle had shot him. The two clerks working at the station described the shooter as a bigger, African American man, which matched Ferrell's description of Kindle. Several shell casings were found at the scene. In the context of the record, the video was not of great importance and was not emphasized by the State. It did not identify Kindle as the shooter and served merely to corroborate the general circumstances testified to by the eyewitnesses.

Having considered the admission of the video in light of the record, and assuming without deciding that admission of the video constituted error, we nevertheless hold that the trial

7

court's admission of the video recording did not adversely influence the jury or had only a slight effect. *See Motilla*, 78 S.W.3d at 359. Thus, we find that any error in the admission of the video was harmless. *See* TEX. R. APP. P. 44.2(b). Accordingly, we overrule this point of error and affirm the trial court's judgment.


Charles van Cleef
Justice

Date Submitted:    June 27, 2022
Date Decided:     July 1, 2022

Do Not Publish