**In The**

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

**NO. 09-21-00386-CR**
_____

**ANDREW COLLIN POTTER, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

**On Appeal from the 359th District Court**
**Montgomery County, Texas**
**Trial Cause No. 18-12-16820-CR**

**MEMORANDUM OPINION**

Andrew Collin Potter appeals his conviction for continuous sexual abuse of, Sara, a child.[1] Tex. Penal Code Ann. § 21.02(b). In three issues on appeal, Potter argues the trial court erred by denying his two motions for mistrial, contending that

---

[1] We have used pseudonyms to protect the privacy of several individuals who are mentioned in the opinion. *See* Tex. Const. art. I, § 30(a)(1) (granting crime victims "the right to be treated with fairness and with respect to the victims' dignity and privacy throughout the criminal justice process").

the State violated the Michael Morton Act and Brady requests by failing to disclose material evidence, and by erroneously admitting Sexual Assault Nurse Examination records. We affirm.

## Background

We limit our recitation of the background facts to those necessary to address the issues raised on appeal. Potter married Sally in 2014. Sara is Sally's youngest sister. Sara was seventeen years old at the time of trial and testified that when Potter first married Sally, Sara considered her relationship with Potter to be "like a sister-in-law[,]" but it became more "personal[.]" According to Sara, she and Potter started "dating" when Sara was around "11 or 12" and while Potter was still married to Sally. Potter became more sexual with Sara, grabbing her breast, touching her vagina, eventually escalating to sexual intercourse. Sara testified that in 2017, Sally and Potter separated, but Potter continued to have a sexual relationship with Sara. Potter bought Sara a cell phone to communicate with her, and he would pick her up from her home, and they would have sex in his vehicle. Sara hid the cell phone in one of her stuffed animals. Sara confided in her best friends, Cindy and Callie, that she was in a relationship with an "older boy." She testified that her friends did not know it was Potter, but they had "suspicions." Unbeknownst to Sara, her friends recorded the conversation Sara had been telling them about her sexual relationship with the "older boy" and the friends sent the recording to Sara's mother. When Sara

2

found out the friends sent the recording to her parents, she called Potter and told him, and he told her to throw the phone away that he had given her, and she threw it into the lake.

Sara also testified that before her friends told her parents, she recalled that Cindy had observed Sara on a FaceTime phone call with Potter. In the FaceTime call, Potter told Sara that Cindy was "really pretty[,]" and that he wanted to have a "threesome" with Sara and Cindy.

When Cindy testified, she testified that she remembered being with Sara when Sara had a Facetime call with someone known as "Panda," and initially Sara went to the bathroom to take the call and then Sara came out of the bathroom while still on the Facetime call with "Panda." Cindy testified that she observed the older man on the call. And Cindy recalled that the older man tried to get Sara to turn the camera around and show him Cindy's "butt" and "boobs" that he wanted to have a "threesome." Cindy stated that the person she saw on the Facetime call was Potter, and she identified him in the courtroom. After Cindy testified and identified Potter as the person on the Facetime call, the court adjourned for the day and on the next day, the defense attorney argued:

> And at the conclusion of [Cindy's] testimony yesterday, we approached [the State's Attorney] and asked him about the -- you know, when he knew about this testimony and why he did not disclose it to us. And we learned at that time that he, in fact -- well, I guess at that point, he was unclear whether he interviewed [Cindy] in advance or not. But it was our understanding that she had been interviewed in preparation for trial

3

during which time she had given inconsistent statements, including, at some point, a statement that -- reflected her testimony that she gave on the stand. She's also given inconsistent statements to the State, at other times when she was preparing for trial, regarding not being able to identify him or not being able to see him on the FaceTime video. That was also not disclosed to us in advance of trial or at any point until we asked for it and we were told this morning.

So that's – that's my initial objection, that we believe that the State has violated discovery statute. They also failed to give us proper extraneous notice as to what amounts to attempted online solicitation of a child, which is a significant offense that the State is well aware of. And they should have given us, you know, more notice about that particular offense, as well as the information that was in their possession. I think it's important to point out, Judge, that the officer testified that there was no attempt to interview [Cindy]. We had no discovery whatsoever about [Cindy]. Based on discovery that we had been given, it is our assumption that the only purpose that she would be taking the stand for was to -- possibly to authenticate the recording that was discussed earlier in the proceedings. And so, we were caught completely by surprise. And based on all that, I know that the Government will argue that this is -- these statements were disclosed during trial preparation. They may argue that they are work product; but the discovery statute is very clear that if they are in possession of any evidence that's material, that they have a duty to disclose it to us. If they are in possession of any evidence that tends to be exculpatory, they must give it to us when they have it and in reasonable time before trial. And that was not done.

So that is our initial objection. And I would like to hear from the State about when. And I would ask the Court to ask them about when they knew about these disclosures and why they did not disclose them to the Defense and then we can proceed.

[State's Attorney]: Yes, Judge. So in our conference prior to going on the Record, I laid out the *Brady* notice. And so now I would like to do that for the Record –

THE COURT: Okay.

4

[State's Attorney]: -- so that it is straight as far as the notice that we're providing.

I, [State's Attorney], met with the witness, [Cindy], in December of 2020; and it was in preparation for trial at that time and she described - - specifically relating to the incident that she testified to, she described that she walked into a room and saw [Sara] on FaceTime showing her chest to the person. She stated that she could see the face of the person that [Sara] was FaceTiming and that it appeared to be a much older male. And said that she could identify him from his booking photo as Andrew Potter.

On Monday of this week before trial, [], whose witness it was at trial, met with the witness, [Cindy]. I was not there. My understanding of that meeting is that when asked [Cindy] said that she -- she didn't think that she saw the face on the screen. She knew that this person had glasses, but she didn't know how she knew that. Obviously, then the next day, on Tuesday, she testified. I said that she did see the face on the screen and then did an in-court identification of Mr. Potter. That was a surprise to []. So that is the disclosures. The discrepancy arose on the week of trial. So that is the notice that is the events that led to where we are.

Potter's trial counsel also requested a mistrial. Trial counsel argued that the State failed to turn over exculpatory evidence about Cindy's contradictory identification of Potter from the FaceTime call. The trial judge overruled the objection, denied the request for a mistrial, and allowed the defense attorney to cross-examine the witness about her inconsistent statements. According to Cindy, she believed that she would not have been able to identify Potter on the FaceTime call if the State did not show her a picture of Potter. She could not recall whether she was asked or told that the person in the picture was Potter.

5

Sally, Sara's older sister, testified that after Sara told her family about the sexual relationship with Potter, Potter called Sally threatening to kill himself unless Sally repaired his relationship between Potter and Sara. Potter wanted Sally to get her parents to let Potter talk to Sara. During cross-examination, Sally stated that she could not recall whether she had previously told investigators that Potter threatened suicide, but she recalled that she told the State about the suicide threat in their first meeting preparing for trial "over a year" ago.

After Sally's testimony that Potter threatened suicide, Potter's counsel moved for mistrial on the grounds that the state had failed to disclose that Sally would testify that Potter threatened suicide. The trial court denied the motion for a mistrial.

At the end of trial, the jury found Potter guilty. Potter was convicted and sentenced to 25 years' incarceration in the Texas Department of Criminal Justice. Potter timely appealed.

**Issues One and Two**

In his first and second issues, Potter complains the State failed to provide exculpatory evidence in violation of statutory and constitutional requirements. Potter contends this evidence includes statements made by Cindy to the State in interviews that she could not identify Potter from the FaceTime call with Sara, and that the State failed to disclose statements from Sally that Potter had threatened to commit suicide after Sara's allegations were revealed. More specifically, Potter outlines several

6

pieces of allegedly exculpatory evidence he claims that the State withheld. These include: (1) Cindy's testimony that she could identify Potter after witnessing a FaceTime call between Sara and Potter in which Potter solicited her for a threesome; and (2) Sally's testimony that Potter threatened to kill himself during a phone call while he held a gun to his head. Potter contends the State had this information in its file, and it should have been disclosed to Potter before trial. According to Potter, failing to disclose it violated article 39.14 of the Code of Criminal Procedure and *Brady* requirements. *See* Tex. Code Crim. Proc. Ann. Art. 39.14; *Brady v. Maryland*, 373 U.S. 83, 87 (1963).

Potter raised the first complaint after unobjected to testimony was admitted and the second complaint about the suicide threat was admitted over a hearsay objection. In each case, after admission of the evidence, Potter's attorney moved for a mistrial. We review a trial court's denial of a motion for mistrial for an abuse of discretion, viewing the evidence in the light most favorable to the trial court's ruling and considering only those arguments before the trial court at the time of the ruling. *See Ocon v. State*, 284 S.W.3d 880, 884 (Tex. Crim. App. 2009). We must uphold the ruling if it was within the zone of reasonable disagreement. *Coble v. State*, 330 S.W.3d 253, 292 (Tex. Crim. App. 2010). We reverse the ruling only if the trial court's decision was clearly erroneous and arbitrary. *Riley v. State*, 378 S.W.3d 453, 457 (Tex. Crim. App. 2012).

7

Mistrial is appropriate only in extreme circumstances "for a narrow class of highly prejudicial and incurable errors[,]" because it "is of such character as to suggest the impossibility of withdrawing the impression produced on the minds of the jurors." *Ocon,* 284 S.W.3d at 884; *Ladd v. State*, 3 S.W.3d 547, 567 (Tex. Crim. App. 1999). In determining whether allegedly prejudicial testimony warrants a mistrial, we consider (1) the severity of the misconduct and the magnitude of the prejudicial effect, (2) the curative measures taken, and (3) the certainty of conviction absent the misconduct. *Ramon v. State*, 159 S.W.3d 927, 929 (Tex. Crim. App. 2004).

A *Brady* violation occurs when the State suppresses, willfully or inadvertently, evidence favorable to the defendant. *Harm v. State*, 183 S.W.3d 403, 406 (Tex. Crim. App. 2006); *see also Brady*, 373 U.S. at 87. To establish a *Brady* violation, a defendant must show that (1) the prosecutor failed to disclose evidence, (2) the evidence is favorable to the accused, and (3) the evidence is material. *Harm*, 183 S.W.3d at 406.

Prosecutors have a duty to learn of *Brady* evidence known to others acting on the State's behalf in a particular case. *Id. Brady* does not require prosecutors to disclose exculpatory information that the State does not have in its possession and that is not known to exist. *Pena v. State*, 353 S.W.3d 797, 810 (Tex. Crim. App. 2011); *Harm,* 183 S.W.3d at 407. Similarly, the State does not have a duty to disclose

8

the information if the defendant was aware of the exculpatory evidence or could have accessed it from other sources. *Pena*, 353 S.W.3d at 810. Under *Brady*, "evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the Defense, the result of the proceeding would have been different." *U.S. v. Bagley*, 473 U.S. 667, 682 (1985). A "reasonable probability" is one that undermines confidence in the outcome. *Id*.

Article 39.14 of the Texas Code of Criminal Procedure, known as the Michael Morton Act, provides as follows, in pertinent part:

(a) Subject to the restrictions provided by Section 264.408, Family Code, and Article 39.15 of this code, as soon as practicable after receiving a timely request from the defendant[,] the state shall produce and permit the inspection and the electronic duplication, copying, and photographing, by or on behalf of the defendant, of any offense reports, any designated documents, papers, written or recorded statements of the defendant or a witness, including witness statements of law enforcement officers but not including the work product of counsel for the state in the case and their investigators and their notes or report, or any designated books, accounts, letters, photographs, or objects or other tangible things not otherwise privileged that constitute or contain evidence material to any matter involved in the action and that are in the possession, custody, or control of the state or any person under contract with the state. The state may provide to the defendant electronic duplicates of any documents or other information described by this article. The rights granted to the defendant under this article do not extend to written communications between the state and an agent, representative, or employee of the state. This article does not authorize the removal of the documents, items, or information from the possession of the state, and any inspection shall be in the presence of a representative of the state.

. . . .

(h) Notwithstanding any other provision of this article, the state shall disclose to the defendant any exculpatory, impeachment, or mitigating document, item, or information in the possession, custody, or control of the state that tends to negate the guilt of the defendant or would tend to reduce the punishment for the offense charged.

Tex. Code Crim. Proc. Ann. art. 39.14(a), (h).

Texas Code of Criminal Procedure article 39.14 places an affirmative duty to disclose any exculpatory, impeachment, or mitigating document, item, or information in its possession, custody, or control that tends to negate the guilt of the defendant or would tend to reduce the punishment for the offense charged. *See* Tex. Code Crim. Proc. Ann. art. 39.14(h). The Legislature did not limit article 39.14(h)'s applicability to "material" evidence, so this duty to disclose is broader than the prosecutor's duty to disclose as a matter of due process under *Brady*. *See Watkins v. State*, 619 S.W.3d 265, 277 (Tex. Crim. App. 2021). The word "material" appearing elsewhere in article 39.14 means "'having a logical connection to a consequential fact'" and is synonymous with "relevant" considering the statutory context. *See id*. at 290. If the State violates article 39.14 by not turning over evidence, we must conduct a harm analysis. *See id*. at 291 (determining the State failed to turn over exhibits in violation of 39.14 and remanding case to court of appeals for a harm analysis); *Sopko v. State*, 637 S.W.3d 252, 256 (Tex. App.—Fort Worth 2021, no pet.) (requiring a harm analysis if a trial court abuses its discretion in violation of 39.14).

During trial, Potter's Defense attorney moved for two mistrials. We will review each motion for mistrial individually.

**Potter's First Motion for Mistrial**

After Cindy's testimony on the first day of trial, Defense Counsel approached the trial court outside the presence of the jury. In the bench conference, Defense Counsel explained he was surprised by Cindy's testimony that she could identify Potter in a FaceTime call she had witnessed between Sara and Potter, and that in that call Potter asked the girls for a "threesome[.]" Defense Counsel stated that the defense had been told by the State that Cindy had provided conflicting statements to the State as to whether she could identify Potter in that call. During the bench conference, the State's attorney told the trial court that he met with Cindy in December 2020, in preparation for trial, and at that time Cindy said she could identify Potter as the person on the FaceTime call with Sara via Potter's booking photo. The Monday before trial Cindy was again interviewed by the State and she told another district attorney that she did not believe she saw the face on the FaceTime call, stating that the person in the call had glasses, but she could not remember how she knew the person had glasses. According to the State, when Cindy testified at trial that she did see the face on the FaceTime phone call, and identified Potter, it was a surprise to the State, and they then made disclosures to Defense Counsel.

11

The State argued that this did not violate article 39.14, as it was "work product of counsel[,]" not a written statement provided by a witness. The State observed that if this material consisted of "notes taken during a meeting, then those are not required to be provided because those are work product." The State maintained that the State's obligation to produce the information "would kick in only upon a discrepancy that could be used for impeachment, which is what happened yesterday at trial and that's why we're notifying the Defense now." The State told the trial court that the positive identification of Potter on a FaceTime call is "inculpatory[,]" not "exculpatory[,]" and that inculpatory evidence is "specifically…carved out of 39.14." The State argued that Cindy was disclosed as a witness, discussed in the report, and included in a separate phone call with the State, which was provided to the Defense. The State argued that it complied because it disclosed the information before Defense Counsel's cross-examination of Cindy.

Defense Counsel countered that the State's actions were an "intentional violation[,]" because the State "did some sort of analysis about whether or not this was work product or not." He acknowledged that the State had provided some disclosures about Cindy, but not any information on Cindy's "different stories[.]" According to Defense Counsel, "Article 39.14's exclusion of privileged material for a -- work product would be a privileged material, does not trump the due process requirement of disclosure under *Brady*." Defense Counsel argued that this was an

intentional decision by the State to decline to inform Defense of something they could have used to impeach the witness. Defense Counsel then moved for a mistrial.

Before ruling, the trial court allowed the attorneys to obtain further testimony from Cindy outside the presence of the jury regarding her identification. Cindy stated that she remembered telling the State in December 2020 that she could identify Potter from the FaceTime call with Sara. She also acknowledged that the Monday before trial, she told the District Attorney's office that she was not sure she saw the face on the FaceTime call. Cindy explained that she made that statement to the prosecutors because it had been so long ago, she could not remember. She further explained that the discrepancy between her statement on Monday and her in-court identification was due to the time lapse and that when she was in court the day before, "I looked around and then I could see who it was[,] [l]ike, my brain remembered and picked it up."

The trial court concluded the hearing by determining the information should have been disclosed to the Defense, but because Cindy was still on the stand for cross-examination, a "less drastic alternative" was to allow the Defense to cross-examine and impeach Cindy about such statements. The Defense Attorney cross-examined Cindy about her testimony, about her inconsistent statements and the identification of Potter, and about her 9-1-1 call that she made to report what happened.

First, we address counsel's failure to request a motion for continuance when alleging a Brady violation. *See Cohen v. State,* 966 S.W.2d 756, 763 *(*Tex. App.—Beaumont 1998, pet. ref'd*)* ("A defendant who fails to avail himself of this less drastic remedy waives any error resulting from the *Brady* violation."). Potter did not ask the trial court for a continuance, so he waives any *Brady* violation. *Id*.

Second, even assuming this complaint had been preserved for our review, we cannot say the trial court erred in denying the mistrial, and we conclude Potter was not harmed by the mid-trial revelation. Here, Cindy was still subject to cross-examination when Potter moved for a mistrial. Potter's trial counsel argued that if they had learned about Cindy's inconsistent statements identifying Potter on the FaceTime call, they could have used this information to impeach Cindy at trial. The trial court, in denying Potter's motion for mistrial, explained that Potter's counsel could still cross-examine and impeach Cindy about the statements she made to the State. Potter's attorney conducted a full cross-examination of Cindy and had the opportunity to impeach Cindy with the information he claims was withheld. We cannot say the trial court erred in denying the motion for mistrial. *See Kulow v. State,* 524 S.W.3d 383, 388 (Tex. App.—Houston [14th Dist.] 2017, pet. ref'd). Additionally, on the record before us we cannot say the alleged 39.14 violation had a substantial and injurious effect or influence in determining the jury's verdict. *Fortuna v. State*, 665 S.W.3d 861, 869 (Tex. App.—Houston [14th Dist.] 2023, no

14

pet.) (An article 39.14 "[e]rror affects substantial rights only if the error had a substantial and injurious effect or influence in determining the jury's verdict."). If we have a fair assurance from examination of the record as a whole that the error did not influence the jury, or had but a slight effect, we will not overturn the conviction. *Id.* The jury heard Potter's attorney cross-examine the witness regarding the prior inconsistent statements made in the prosecution interviews, as well as the direct and re-direct testimony from the witness, and based on the record as a whole, we have fair assurance that any error did not affect Potter's substantial rights and could only have had a slight effect, if any, in this case.

**Second Motion for Mistrial**

Potter's second motion for a mistrial came during Sally's testimony. During Sally's direct examination, she testified to the following:

> Q. And how -- during your separation and divorce with the defendant was he upset with you for taking away his friend, [Sara]?
>
> A. Yes.
>
> Q. Did he make any comments to you to that effect?
>
> A. He called me one night during Hurricane Harvey with a gun to his head on FaceTime. And --
>
> [TRIAL DEFENSE COUNSEL]: Objection, Your Honor. I'm sorry. We're getting into hearsay again.
>
> [THE STATE]: It's a statement by party-opponent, Judge.
>
> THE COURT: Okay. It's overruled.

15

Q. [BY THE STATE] What did he tell you on this FaceTime call?

A. He told me if I did not fix the relationship with [Sara] and told my parents to let her talk to him again that he would kill himself.

Potter's trial counsel elicited the following testimony during his cross-examination and moved for a mistrial.

Q. I want to ask you, as far as -- do you remember being interviewed by a police officer in this case about these allegations?

A. I know I had talked with a detective, but I can't recall if it was from the initial allegations in 2017 or in 2018 when [Sara] fully opened up about everything.

Q. Okay. But it's fair to say that you never mentioned this statement about him threatening to kill himself to any of the police officers, right?

A. That night I did make a phone call to the suicide hotline. But as far as any police officers, I don't think so.

Q. Okay. So it's part of this investigation? You didn't tell any police officers anything about that particular statement?

A. Not that I recall.

Q. Okay. I'm assuming that as we got ready for this trial, or maybe on some previous dates, that you've had an opportunity to get prepared for your testimony; is that right?

A. Yes, sir.

Q. And have you met with the prosecutors to get prepared for trial?

A. Yes, sir.

Q. Okay. And when did you tell them this particular statement, do you recall, about him threatening to kill himself?

16

A. I know we had talked about it maybe in our first or second meeting. But I know that's been probably over a year now.

Q. Okay. Who did you meet with at that time?

A. [The State].

Q. Okay. So it's fair to say that you've met with [the State] several times getting ready for your testimony?

A. Yes, sir.

Q. Okay. And you think that you've met with [the State] on three occasions getting ready for trial?

A. I know we've had for sure two meetings and a phone conversation. I can't recall if we've had a third one in person.

Q. Okay. And do you remember when you would have given him this statement about Andrew threatening to kill himself?

A. It would have been the first one.

Q. Do you remember where you met when you were getting prepared? Did he come out to the house or did you go meet with him in the office?

A. We met in his office.

Q. Okay.

Potter's trial counsel argued that the State had meetings and the witness made statements to the State regarding matters that were not disclosed in violation of 39.14. The State contended the statement about suicide was not exculpatory, that it was made in "witness preparation[,]" and not in a written record that needed to be disclosed per 39.14. In overruling Potter's motion for a mistrial, the trial court noted

17

that the witness was disclosed to the Defense and the Defense had access to the same witnesses as the State.

First, we examine whether Potter's failure to ask for a motion for continuance is a procedural defect preventing our review on appeal. *See Cohen*, 966 S.W.2d at 763. At trial, Potter's counsel moved for a mistrial after the State's direct examination and Potter's partial cross-examination of Sally, in which Potter asked Sally about the statement she made during trial regarding Potter's suicide threat. Potter argues on appeal that this statement should have been disclosed to him and the failure to do so violated 39.14. He argued he would have used the inconsistent statement to question Sally on cross-examination. Potter again did not request a motion for continuance before moving for mistrial. Therefore, he waives any review of this issue on appeal. *Id*. But even if Potter had preserved this issue for our review, he has not shown that he was harmed by the disclosure.

In his brief, Potter explains that the State's focus on exculpatory evidence is misplaced, and that Sally's statements go to her credibility and subject her to impeachment on cross-examination. Potter's motion for mistrial was made during Sally's cross-examination and he questioned her regarding her inconsistent statements. As noted above during Cindy's testimony, Potter had the opportunity to cross-examine Sally regarding her inconsistent statements and used these inconsistencies as impeachment evidence. *See Kulow*, 524 S.W.3d 383 at 388

18

(explaining the appellant did not show prejudice in a *Brady* violation for delayed disclosure when given the opportunity to cross-examine the witness before finishing his cross-examination); *see also Sopko*, 637 S.W.3d at 256-57 (applying Tex. R. App. P. 44.2(b) harm analysis to an article 39.14 violation). On the record before us we cannot say the alleged 39.14 violation had a substantial and injurious effect or influence in determining the jury's verdict. See *Fortuna*, 665 S.W.3d at 869.

We overrule Potter's first and second issues on appeal.

### Issue Three

In his final issue, Potter argues that the admission of Sexual Assault Nurse Examiner ("SANE") records through nurse Sharon Record was erroneous because the record constituted inadmissible hearsay. Specifically, Potter contends that the records are not admissible under Texas Rule of Evidence 803(4), the medical records exception, because those records were not "neutrally obtained[,]" and were created by "services…to advocate for the health and welfare of children." We review a trial court's evidentiary ruling under an abuse of discretion standard of review. See *Taylor v. State*, 268 S.W.3d 571, 578-79 (Tex. Crim. App. 2008).

Hearsay is an out-of-court statement that a party offers to prove the truth of the matter asserted within the statement. Tex. R. Evid. 801(d). Hearsay is not admissible except as provided by statute, the rules of evidence, or by other rules prescribed under statutory authority. Tex. R. Evid. 802. Once the opponent of

hearsay evidence makes the proper objection, it becomes the burden of the proponent of the evidence to establish that an exception applies that would make the evidence admissible despite its hearsay character. See *Taylor*, 268 S.W.3d at 578-79. There are several exceptions to hearsay, including an exception for "[a] statement that: (A) is made for—and is reasonably pertinent to—medical diagnosis or treatment; and (B) describes medical history; past or present symptoms or sensations; their inception; or their general cause." Tex. R. Evid. 803(4). This exception presumes that the patient understands the importance of being truthful with the medical personnel involved to receive an accurate diagnosis or treatment. *See Puderbaugh v. State*, 31 S.W.3d 683, 685 (Tex. App.—Beaumont 2000, pet. ref'd); *Franklin v. State*, 459 S.W.3d 670, 676 (Tex. App.—Texarkana 2015, pet. ref'd); *Beheler v. State*, 3 S.W.3d 182, 188 (Tex. App.—Fort Worth 1999, pet. ref'd). For statements to be admissible under Rule 803(4), the proponent of the evidence must show that: (1) the declarant was aware that the statements were made for the purposes of medical diagnosis or treatment and that proper diagnosis or treatment depended on the veracity of the statement; and (2) the particular statement offered is also "pertinent to treatment"; that is, it was reasonable for the healthcare provider to rely on the particular information in treating the declarant. *See Taylor*, 268 S.W.3d at 589, 591; *Hanke v. State*, No. 09-14-00326-CR, 2015 Tex. App. LEXIS 9884 at *18 (Tex. App.—Beaumont Sept. 23, 2015, no pet.) (mem. op., not designated for

20

publication) (citing *Taylor,* 268 S.W.3d at 588-91; *Mbugua v. State*, 312 S.W.3d 657, 670-71 (Tex. App.—Houston [1st Dist.] 2009, pet. ref'd)); *Prieto v. State*, 337 S.W.3d 918, 921 (Tex. App.—Amarillo 2011, pet. ref'd).

In his brief, Potter argues that SANE records are not neutrally obtained, because the SANE nurse is conducting a forensic exam on the patient, and the exam includes collecting evidence and releasing her findings to either law enforcement or CPS as a mandated reporter. He directs this Court's attention to the nurse's testimony that she performed a non-acute examination on Sara, which Potter argues was performed to collect evidence to introduce at trial.

The SANE nurse testified the purpose of the exam is for "diagnosis and treatment." She stated that she does not meet with law enforcement before her examination and receives a summary statement from a referral that could be prepared by either law enforcement or CPS. She also testified that she sometimes does not receive a referral statement. She explained that the history is obtained from the summary statement from a referral and from the patient only, and that while she may not be providing an immediate physical treatment to the patient, such as applying a band-aid to a cut, she is making sure the patient is healthy, both mentally and physically.

We conclude that the records in question fit within rule 803(4)'s medical exception. *Taylor*, 268 S.W.3d at 589 (explaining in analyzing records admitted

21

under 803(4), "it seems only natural to presume that adults, and even children of a sufficient age or apparent maturity, will have an implicit awareness that the doctor's questions are designed to elicit accurate information and that veracity will serve their best interest.); *see also Ramos v. State*, No. 13-22-00293-CR, 2023 WL 8850088, \*\*16-17 (Tex. App.—Corpus Christi-Edinburg Dec. 21, 2023, no pet.) (mem. op. not designated for publication) (no evidence in the record, besides the SANE's testimony that she "collects evidence[,]" to show a bias in the collection of evidence or that the victim was untruthful in her statements during the examination). We reject Potter's argument that the SANE nurse here was merely collecting evidence to be turned over to CPS or the police.

This Court and others have previously rejected similar arguments. *See e.g.*, *Estes v. State*, 487 S.W.3d 737, 755-57 (Tex. App.—Fort Worth 2016, pet. granted) (concluding that the victim's statements to a sexual assault nurse were admissible under Rule 803(4)); *Berkley v. State*, 298 S.W.3d 712, 715 (Tex. App.— San Antonio 2009, pet. ref'd) (holding that statements made by sexual assault victim to a SANE nurse, which were included in medical records, were not testimonial because statements were made for purpose of medical diagnosis and treatment); *Beheler*, 3 S.W.3d at 188-89 (concluding the trial court did not err in admitting the statements the victim made to a sexual assault nurse about the assault under Rule 803(4)); *Green v. State*, No. 09-15-00220-CR, 2017 Tex. App. LEXIS

22

598, \*\*7-8 (Tex. App.—Beaumont Jan. 25, 2017, no pet.) (mem op., not designated for publication) (the trial court did not abuse its discretion concluding that the nurse's testimony and report were admissible over Green's hearsay objections under Rule 803(4) of the Texas Rules of Evidence); *Martinez v. State*, No. 01-15-00823-CR, 2016 Tex. App. LEXIS 12345, at \*\*11-12 (Tex. App.—Houston [1st Dist.] Nov. 17, 2016, pet. ref'd) (mem. op., not designated for publication) (no abuse of discretion was shown where the trial court admitted the statements a victim made about an assault to a sexual assault nurse); *Segura v. State*, No. 05-15-00032-CR, 2015 Tex. App. LEXIS 12425, at \*12 (Tex. App.—Dallas Dec. 8, 2015, no pet.) (mem. op., not designated for publication) (concluding the trial court did not abuse its discretion by admitting the statements the victim made to a sexual assault nurse based on Rule 803(4)). As demonstrated by the SANES's testimony in this case, and by the contents of her report, the purpose of the exam was for diagnosis and treatment. Based on the nurse's testimony, the trial court could have found that the victim's statements during the SANE examination were reasonably pertinent to the diagnosis and treatment of the victim. *See Prieto*, 337 S.W.3d at 921. Because the statements were made for the purposes of medical diagnosis and treatment, we conclude that the trial court did not abuse its discretion by overruling the objection and admitting the SANE records and testimony into evidence. *See Beheler*, 3 S.W.3d at 189.

We also note that the identity of an offender may also fall within the ambit of the hearsay exception governing statements made for medical diagnosis or treatment because it is relevant to treatment, particularly with child abuse and family violence cases. *See Taylor*, 268 S.W.3d at 591; *Gutierrez v. State*, 630 S.W.3d 270, 280 (Tex. App.—Eastland 2020, pet. ref'd). "[B]ecause the treatment of child abuse victims includes removing the child from the abusive setting, the identity of the abuser is pertinent to the medical treatment of the child." *Garzoria v. State*, 2018 Tex. App. LEXIS 7023, at *6 (Tex. App.—Beaumont Aug. 29, 2018, pet. ref'd) (mem. op., not designated for publication) (citing *Fleming v. State,* 819 S.W.2d 237, 247 (Tex. App.—Austin 1991, pet. ref'd)).

We conclude that the trial court did not abuse its discretion in admitting the SANE records and we overrule Potter's final issue. *See* Tex. R. Evid. 803(4).

## Conclusion

Having overruled all of Potter's issues on appeal, we affirm the trial court's judgment.

AFFIRMED.

JAY WRIGHT
Justice

Submitted on August 17, 2023
Opinion Delivered March 6, 2024
Do Not Publish

Before Golemon, C.J., Johnson and Wright, JJ.

24